**PEAVY–BYRNES LUMBER CO., Inc., et al.**
**v. LONG–BELL LUMBER CO.**
Civil Action No. 379.

District Court, W. D. Louisiana,
Lake Charles Division.
June 9, 1944.

John B. Files, of Shreveport, La., for plaintiffs.

Flavel Robertson (of Lombardi, Robertson, Fligg & McLean), of Kansas City, Mo., and Brady Cole (of Baker, Botts, Andrews, & Wharton), of Houston, Tex., for defendant.

PORTERIE, District Judge.

There have been contractual relations between the two litigants from the year 1926 to the year 1938. Extensive exploitation of large timber tracts was the subject of their mutual interest. All differences between them have been amicably settled, except the question as to which of the two is to pay an amount of $10,624.08, representing the taxes on the timbered tracts for the years 1932 through 1937. The taxes were paid by the seller, though the alienation records of the parish where the timber was situated showed the sale and named the purchaser.

The narrative of the case is omitted for the sake of brevity, since it may be readily gleaned from the extended finding of facts.

After full and deliberate consideration of the evidence and the applicable law, we find that the case is with the defendant. Accordingly, since we agree with them,

we are adopting verbatim the finding of facts and the conclusions of law as prepared by the defendant:

1. Plaintiffs in this suit, the Peavy-Byrnes Lumber Company, Inc., and Peavy-Moore Lumber Company, Inc., are both Louisiana corporations domiciled in the City of Shreveport, Louisiana. The defendant, the Long-Bell Lumber Company, is a Missouri corporation authorized to do business in the State of Louisiana, with offices for the transaction of business in Beauregard Parish, Louisiana. The business of said Company is the manufacture and sale of lumber and lumber products, and in connection with its operations it owns or controls timber and timber rights, logging and railroad franchises, buildings, warehouses, and other properties usually owned and operated by similar concerns. Long-Bell Lumber Sales Corporation was a Delaware corporation authorized to transact business in the State of Louisiana, and it was likewise engaged in the manufacture and sale of lumber and lumber products and in other operations of the same character as those hereinabove described.

2. Plaintiffs entered into contracts with defendant on September 14, 1926, for the purchase by defendant of hardwood timber in Beauregard Parish, Louisiana, one of said contracts being with the Peavy-Byrnes Lumber Company, Inc., for the purchase of timber priced at approximately $452,-000, and the other of said contracts being with Peavy-Moore Lumber Company, Inc., covering the purchase of timber priced at approximately $215,000, making a total cost of timber under both contracts of approximately $665,000. These particular contracts provided that the Long-Bell Lumber Company should pay the taxes on the timber from year to year. They might be cancelled upon payment of certain sums as liquidated damages.

3. On September 11, 1931, a supplemental contract was entered into between the parties, changing the method of payments under the original contracts. In connection therewith the defendant also posted with the plaintiffs, as additional security on the contracts, its note for $28,000 secured by a mortgage on timber on an island in the Sabine River that the Long-Bell Lumber Company had acquired from other vendors.

4. In November, 1930, Long-Bell Lumber Sales Corporation was organized. To it were conveyed by The Long-Bell Lumber Company free and unencumbered assets of the value of approximately $27,-000,000, for which the Long-Bell Lumber Company received all of the stock of the Sales Corporation. The Sales Corporation thereafter conducted the active manufacturing and sales operations that had previously been carried on by the Long-Bell Lumber Company. The reason for the organization of the Sales Corporation was to provide security to certain banks for indebtedness of the parent company of $5,-400,000 and to provide additional working capital.

5. The depression in the lumber industry commenced as early as 1927. In the early thirties it had become apparent, as the depression became progressively more acute, that the Long-Bell Lumber Company would have to be reorganized and that if it was to continue as a going concern it would have to cancel many timber purchase contracts and other contracts requiring the payment of substantial sums of money. Contracts aggregating fixed obligations of millions of dollars were cancelled and negotiations were undertaken with regard to the cancellation of the Peavy contracts. It was proposed that if The Long-Bell Lumber Company would convey to the Peavy Companies the mortgaged timber on Sabine Island and would cause Long-Bell Lumber Sales Corporation to enter into a cutting contract with the Peavy Companies, cancellable upon three months' notice by either party, the old contracts of 1926 would be cancelled. Under this proposal such timber as was cut was to be paid for, until September 1, 1934, at $5 per 1000 feet, and after September 1, 1934, at $6 per 1000 feet. The contract was to provide that if and when the Long-Bell Lumber Sales Corporation had paid in this way "an amount equal to the present principal and taxes," it was to "receive title without any further payments to any remaining timber on the lands." The proposal for a cutting contract was evidenced by letter, dated March 30, 1934, from Mr. A. J. Peavy, President of the Peavy Companies, to Mr. M. B. Nelson, President of the Long-Bell Lumber Sales Corporation.

6. Shortly prior to these negotiations the Long-Bell Lumber Company had instituted proceedings for reorganization in the United States District Court for the Western District of Missouri under Section 77B of the National Bankruptcy Act,

as amended, 11 U.S.C.A. § 207. The cancellation of the Peavy contracts was taken up with Mr. Peavy as a step in the direction of reorganization.

7. Before the Long-Bell Lumber Company could cancel the contracts upon which it had paid a substantial sum, and the Long-Bell Lumber Sales Corporation could enter into the proposed new contract, two conditions were required to be met, (1) the approval of the bank creditors of the Sales Corporation to whom it was indebted to the extent of more than $4,000,000, and (2) the approval of the United States District Court for the Western District of Missouri, the court in which the said reorganization proceedings for the Long-Bell Lumber Company were pending. The approval of the court was required by reason of the proposal to cancel the equity of The Long-Bell Lumber Company in the original Peavy contracts and by reason of the further proposal to convey to the Peavy Companies the mortgaged island timber belonging to the Company. Furthermore, the Long-Bell Lumber Sales Corporation was a one hundred per cent owned subsidiary of the Long-Bell Lumber Company, and, in contemplation of a plan of reorganization, the latter Company, as sole stockholder of the Sales Corporation, would have approved no obligation to be assumed by the Sales Corporation without first securing consent of said court for it to do so.

8. As a condition precedent to securing of approval of the banks and of the said court to the entering into of the cutting contract, it was necessary to give assurance that this contract could be cancelled upon three months' notice. This was primarily so, in so far as the court was concerned, because the court would not have approved the creation of any new contract liabilities by the debtor or any of its subsidiaries that could not be cancelled if they should become burdensome.

9. After securing consent of the bankers to the proposed contract the contract was prepared and dated June 1, 1934, but it was not executed and delivered until after the approval of the court had been obtained, which approval was contained in the court's order of September 3, 1934. On August 20, 1934, counsel for the Long-Bell Lumber Company sent by letter to Mr. A. J. Peavy, President of the Peavy Companies, copies of the cutting contract, with the request that he hold them until after the hearing in court. On August 22, 1934,

Mr. J. S. Welsh, Secretary-Treasurer of the Peavy Companies, replied stating that the copies of the contracts had been received and that they would be held until further action by the court.

10. On August 17, 1934, the debtor filed in said United States District Court for the Western District of Missouri its petition for the approval of the cutting contract, upon which on said date the court entered an order with regard to notice to be sent in connection therewith. On September 3, 1934, the court's order approving the execution of the cutting contract was entered, as hereinabove stated.

11. The court's order authorized the execution of the contract, but with the specific provision in it that it is to be "terminable by either party thereto upon three months' notice." There was no qualification in the order with respect to this cancellation provision. This order and this provision became inherently a part of the contract without which it could not have been approved.

12. In preparation of the petition of August 17, 1934, for the approval of said cutting contract, the Land Commissioner of the Long-Bell Lumber Sales Corporation wrote a letter to Mr. T. E. Trigg, then General Auditor of the Peavy Companies, asking for certain information as to tax payments that had been made on the timber. Mr. Trigg replied under date of June 16, 1934, giving the requested information. The information involved in this correspondence was needed for the preparation of the documents to be filed with the United States District Court for the Western District of Missouri for the purpose of securing a cancellation of all liabilities on the part of the Long-Bell Lumber Company for the payments of taxes incurred prior to June 1, 1934, and the information was so used.

13. On September 11, 1934, counsel for defendant wrote a letter to Mr. A. J. Peavy, President of the Peavy Companies, advising him that the court had made an order approving the cutting contract and enclosing a copy of said order, and asking Mr. Peavy to execute and return a duplicate original copy of the cutting contract. On September 25, 1934, Mr. J. S. Welsh, for the Peavy Companies, wrote to counsel for the Long-Bell Lumber Sales Corporation stating that the contract had been executed and returning with this letter one executed copy of the contract.

14. Thereafter a short form of the cutting contract was prepared, which was simply and solely an abbreviated form of the longer contract, for recording purposes. It was dated October 23, 1934. It referred to and incorporated therein by reference all of the terms and provisions of the longer contract dated as of June 1, 1934. Duplicate originals of the short form of contract, dated October 23, 1934, were sent by the Land Commissioner of the Long-Bell Sales Corporation to the Peavy Companies on October 23, 1934, and on November 1, 1934, one executed copy was returned. This copy was subsequently recorded.

15. After the execution and delivery of the cutting contract, as of June 1, 1934, Long-Bell Lumber Sales Corporation took possession of the remaining timber and lands described in the cutting contract, and continuously conducted cutting operations thereon.

16. A plan of reorganization for the Long-Bell Lumber Company, debtor, dated January 1, 1935, was filed on March 23, 1935. It dealt with all assets and properties of the Debtor, and with its stock interests and other interests in its subsidiaries and allied companies, including, among others, Long-Bell Lumber Sales Corporation. It provided, briefly, that all assets and properties of the Sales Corporation should be conveyed to the debtor company, and that thereafter the Sales Corporation should be dissolved. An order confirming the said plan of reorganization was duly entered in said court on September 23, 1935. The final decree in the Matter of The Long-Bell Lumber Company, Debtor, was entered in said court on December 21, 1935. On November 30, 1935, in carrying out the plan of reorganization, an assignment of said cutting contract dated as of June 1, 1934, between Long-Bell Lumber Sales Corporation and the Peavy Companies, was made by Long-Bell Lumber Sales Corporation to The Long-Bell Lumber Company.

17. The cutting contract of June 1, 1934, contained the following provisions regarding the obligation of the purchaser to pay:

"Section 2. The Purchaser will pay to the Sellers for all of said timber cut on or before August 31, 1934, at the rate of Five Dollars ($5) per one thousand (1,000) feet, log scale. For all of said timber cut on and after September 1, 1934, the Purchaser will pay to the Sellers at the rate of Six Dollars ($6) per one thousand (1,000) feet, log scale. All of said timber shall be scaled according to the Doyle & Scribner combined Rules: each log shall be scaled at the smaller end the average way, scaling one bark and dividing the fractions. The Purchaser shall pay the Sellers for all timber cut each month on or before the 15th day of the succeeding month at the office of the Sellers at the address mentioned in Section 16 hereof, or if said address be changed as provided in said Section, then at the new address.

"Section 3. This Agreement shall be and remain in full force and effect until all of the merchantable timber now standing, lying or being, or which during the term of this Agreement may be standing, lying or being upon said lands described in Parts I, II, III and IV of said Exhibit A shall have been cut and removed under the terms of this Agreement, or until the sum or sums which shall be paid by the Purchaser to the Sellers for said timber under the terms of this Agreement shall equal said sum of $126,769.77, plus all taxes which may be paid by the Sellers on the property described in said Exhibit A; Provided that either the Sellers or the Purchasers may, at any time, by giving to the other three (3) months' prior written notice, terminate this Agreement."

18. In Section 4 of said cutting contract it provided that:

"If the Sellers should at any time decide that the Purchaser is not cutting and removing said timber as rapidly as it should cut or remove the same, they may (1) so notify the Purchaser and demand more rapid cutting and removal; (2) so notify the Purchaser and demand that the Purchaser pay to the Sellers an amount equal to said sum of $126,769.77, plus all taxes paid by the Sellers on the property described in said Exhibit A, minus all sums which shall at that time have been paid by the Purchaser to the Sellers under the terms of this Agreement; or (3) so notify the Purchaser and terminate this Agreement after giving to the Purchaser three (3) months' prior written notice."

19. Section 5 of said contract provided in part that "the Purchaser shall not be obligated to cut or remove any of said timber which, in its sole discretion, it shall determine cannot be cut and manufactured at a profit." The parties have agreed and stipulated with respect to this provision as follows:

658

"It is further agreed by and between the parties that on or before October 21st, 1938, The Long-Bell Lumber Company had reached the conclusion or determination in the light of previous experience on the subject that it could not cut and manufacture at a profit the timber covered by the contract dated as of June 1st, 1934."

20. Section 6 of said cutting contract contained a provision that if Sellers elected to terminate the agreement the Purchaser could pay the balance of the total price and take the remaining timber.

21. Section 7 of said cutting contract reads:

"If this Agreement shall be terminated in any manner as herein provided, the Purchaser shall incur no liability whatever on account of its failure to cut or remove any of the timber described in said Exhibit A or on account of any act or thing done or omitted to be done under the terms of this Agreement or its operations thereunder."

22. It has been agreed by the parties, and the court finds, that the Long-Bell Lumber Company took physical possession of all of the properties and rights in said timber that had been acquired by Long-Bell Lumber Sales Corporation after the transfer and assignment of said rights to the Long-Bell Lumber Company on November 30, 1935.

23. By October, 1938, the Long-Bell Companies had cut and paid for all of the original $665,000 worth of timber contracted for purchase from the Peavy Companies with the exception of timber valued under the contracts at $51,360.24. Continued operating losses had by that time convinced The Long-Bell Lumber Company that the timber could not be operated profitably.

24. On October 21, 1938, Mr. John Mantle, General Manager of the Southern Division of the Long-Bell Lumber Company (the Lumber Company having previously taken over the contract from the Sales Corporation), wrote to Mr. A. J. Peavy, President of the Peavy Companies, advising that Long-Bell had found it necessary to discontinue the cutting contract. Thereupon Mr. A. J. Peavy, for the Peavy Companies, replied on October 24, 1938, requesting that the Long-Bell Lumber Company "continue cutting the timber on these lands until all of the merchantable timber had been removed and paid for or pay us at once $51,672.80." On November 1, 1938, a further notice of cancellation was sent—this time by registered mail by Mr. R. T. Demsey, Vice-President of The Long-Bell Lumber Company, to the Peavy Companies, and on the same day Mr. Mantle wrote another letter to Mr. Peavy in answer to his communication of October 24, 1938, which letter was enclosed with the written notice of cancellation sent by Mr. Demsey.

25. Upon the effective cancellation date of the cutting contract all timber remaining uncut was left untouched and turned back to the Peavy Companies. Some months following, the controversy between the parties existing, the suggestion was made that the timber remaining on these lands should be cruised without prejudice to either party. Two estimators were selected—one by Long-Bell and one by Peavy. A contract was entered into, dated March 29, 1934, providing for a cruise of the timber remaining.

26. As a result of the cruise the estimators agreed upon the timber left, which had gone back to the Peavy Companies, this timber alone having a value of about $34,000. Subsequently, Mr. Sailor, the Long-Bell manager at DeRidder, Louisiana, by agreement of the parties sold for the account of the parties the property remaining at Camp Cupples, Louisiana. After the cruise and the sale of the properties at Camp Cupples, the parties made a settlement between themselves of all controversies, except a controversy arising out of a claim by the Peavy Companies against the Long-Bell Lumber Company for the sum of $10,624.08, representing ad valorem taxes paid by the former companies for the years of 1932 through 1937 on the timber involved in the foregoing transactions; and, with regard to this particular controversy, the settlement agreement provided that it should "not affect the rights of either party hereto as for liability of said taxes under said contract, and that the said rights shall remain outstanding for such action as the Peavy Companies may see fit to take."

### Conclusions of Law

1. The contracts dated September 14, 1926, between plaintiffs and defendant were cancelled and all rights and obligations thereunder terminated at the time the cutting contract dated as of June 1, 1934, was

entered into between plaintiffs and Long-Bell Lumber Sales Corporation.

2. The cutting contract of June 1, 1934, provided without qualification "that either the Sellers or the Purchaser may, at any time, by giving to the other three (3) months' prior written notice, terminate this Agreement."

3. The cancellation provision was a condition precedent to the making of the cutting contract without which the contract would not have been approved by the United States District Court for the Western District of Missouri, and could not have been executed and delivered.

4. The cutting contract of June 1, 1934, further provided in Section 5 that "the Purchaser shall not be obligated to cut or remove any of said timber which, in its sole discretion, it shall determine cannot be cut or manufactured at a profit." This provision was separate and apart and in addition to the other provisions in the contract. It has been agreed by and between the parties "that on or before October 21, 1938, The Long-Bell Lumber Company had reached the conclusion or determination in the light of previous experience on the subject that it could not cut and manufacture at a profit the timber covered by the contract dated as of June 1st, 1934."

█ 5. The said cutting contract in Section 7 provided "if this Agreement shall be terminated in any manner as herein provided, the Purchaser shall incur no liability whatever on account of its failure to cut or remove any of the timber described in said Exhibit A or on account of any act or thing done or omi..ed to be done under the terms of this Agreement or its operations thereunder." Upon cancellation of the contract all liability thereunder terminated.

█ 6. Under authorities cited by both of the parties where the language of an agreement may be susceptible to two meanings, the court will, if possible, give effect to all parts of the instrument, and a construction which gives a reasonable meaning to all of its provisions will be preferred to one which leaves a portion of the writing useless or inexplicable. Under the application of this principle, the cancellation by defendant of the cutting contract terminated all liability thereunder.

█ 7. The provision for cancellation is first contained in said contract in Section 3 preceding the provision in Section 4 upon which plaintiffs rely. Where there are conflicting provisions in two different paragraphs, the one appearing in the first paragraph in sequence prevails. Whitney v. Hagan, 1941, 65 Ga.App. 849, 16 S.E.2d 779; Bean v. Ætna Life Ins. Co., 1903, 111 Tenn. 186, 78 S.W. 104; Osburn v. Smart, Tex.Civ.App., 1932, 58 S.W.2d 1073, writ of error dismissed; G. F. A. Peanut Ass'n v. W. F. Covington Planter Co., 1939, 238 Ala. 562, 192 So. 502; Du Puy v. United States, 1929, 68 Ct.Cl. 574, 35 F.2d 990 at page 1002.

█ 8. The special order of the United States District Court for the Western District of Missouri (the court in which the "debtor" proceedings of the defendant company were then pending) entered on September 3, 1934, authorized the execution of the contract, but with the specific provision that it was to be "terminable by either party thereto upon three months' notice." There was no qualification of any kind with respect to this provision. It became inherently a part of the contract without which it could not have been approved.

█ 9. The reorganization proceedings of the Long-Bell Lumber Company, debtor, were concluded in the year 1935 by the confirmation of a reorganization plan and the entry of a final decree. Under the plan of reorganization the Long-Bell Lumber Sales Corporation was dissolved and all of its assets transferred and assigned to the lumber company. All of this was done by order and direction of the court. Among the assets transferred was the contract of June 1, 1934, between the sales corporation and the Peavy Companies with respect to which the court had specifically ordered that the contract was to be terminable by either party upon three months' notice. The final decree that was entered in connection with the reorganization proceedings contained a provision discharging the debtor company from all debts, claims, and liabilities excepting such of its debts, if any, as are by law excepted from the operation of a discharge in bankruptcy, and except those whose continuance is provided for in the plan; and further enjoined claimants, creditors, and stockholders from commencing any suits or other proceedings against the debtor company or any of its assets or property based upon any claims, excepting only such liabilities and claims as were expressly assumed. Under the cutting contract dated as of June 1, 1934, all liability

ceased upon cancellation. The Peavy Companies had full and complete notice of the special order of September 3, 1934, made by the United States District Court for the Western District of Missouri approving the contract of June 1, 1934, as qualified by the cancellation provision. By reason of the plan of reorganization and final decree in the debtor proceedings, the Peavy Companies can assert no further liability under the said contract dated as of June 1, 1934. Section 77B, sub. g, 11 U.S.C.A. § 207 sub. g; Chapter X, Sec. 224(1), 11 U.S.C.A. § 624(1); Finsletter, The Law of Bankruptcy Reorganization, page 673; Mohonk Realty Corporation v. Wise Shoe Store, Inc., 2 Cir., 111 F.2d 287.

The Court declares the law to be that under the pleadings, evidence, and record in this case, plaintiffs are not entitled to recover. Judgment is rendered in favor of the defendant.

But we should go further and rule upon this case in the contingency that the appellate court would consider that this case is to be decided alone and entirely under the last contract, to-wit, that one dated October 23, 1934.

This means the exclusion of the original contract of 1926, the whole of the bankruptcy proceedings of the Long-Bell Lumber Company under Section 77A, 11 U.S.C.A. § 206, as well as the temporary transfer of liquid assets to the Long-Bell Sales Corporation.

First, though we are now restricting our consideration of this case to the contract of October 23, 1934, we must at once say that the written agreement of June 1, 1934, becomes dominant and controlling because of the following paragraph in the contract of October 23, 1934:

"The prices, terms and conditions of said sale and purchase are set forth in an unrecorded written agreement dated June 1, 1934, between Vendors and Vendee, which is the only other agreement in effect between Vendors and Vendee relating to the properties aforesaid."

That being true, it follows that Items 1, 14, 15, 16, 17, 18, 19, 20, 21, 22, 24, 25, and 26 of our previous finding of facts become declared items in our present finding of facts.

Item 23 of the finding of facts is changed to read as follows:

"By October, 1938, all timber had been cut and paid for except some remaining timber valued at $51,360.24. Continued operating losses had by that time convinced the Long-Bell Lumber Company that the timber could not be further exploited profitably."

Similarly, Items 2, 4, 5, 6, and 7 of our previous conclusions of law become declared items in the conclusions of law now made by us.

 So, again, we declare the law to be that under the pleadings, evidence, and record in this case, the plaintiffs are not entitled to recover.

Since the debt is nonexistent, the application of the plea of prescription filed by the defendant is impossible.

Judgment upon presentation will be signed in accordance with this opinion.