**GIRARD TRUST CO. et al. v. VANCE et al.**

**Civ. A. No. 3713.**

District Court, E. D. Pennsylvania.

Feb. 28, 1946.

110

See, also, 4 F.R.D. 255.

Stradley, Ronon, Stevens & Young, of Philadelphia, Pa., for plaintiff.

Maurice Freedman, of Philadelphia, Pa., Bernard Freedman, of Koehler, Augenblick & Freedman, all of Newark, N. J., and Horace M. Barba, of Philadelphia, Pa., for defendants Long, Postley and Gross.

Frank A. Moorshead, of Philadelphia, Pa., for Samuel Vance, Jr.

KIRKPATRICK, District Judge.

The plaintiffs, on November 16, 1943, sold all the capital stock of Kensington Shipyard and Drydock Corporation to Franklin Machine and Foundry Company, the price being $500 000 in cash and a second mortgage of $300,000, upon the plant, payable to the plaintiffs in proportion to their respective stock interests. An existing RFC first mortgage of approximately $375,000 was to be replaced by a new first mortgage of $375,000 to a local bank.

Thereafter the plaintiffs filed this complaint admitting liability for a commission to the broker or brokers "responsible" for the sale and asking that the defendants, who claim to have acted as brokers in the transaction, be decreed to interplead. The plaintiffs have paid into the Court the sum of $25,000, and stand ready to give, in addition, a bond in the amount of $15,000 to meet all admitted possible liability.

Answers were filed, that of the defendant, Vance, consenting to the interpleader and that of the defendants, Long, Postley and Gross, contesting the right of the plaintiffs to the relief prayed for. The defendant Wilson has been eliminated by stipulation.

A hearing upon the issue of the plaintiffs' right to interpleader was held, testimony was taken and the case is now before the Court for findings, conclusions and decree.

It appears that there are two claims for commissions. Vance, who brought suit in the State Court, claims 5 per cent on the cash part of the purchase price, or $25,000,

and 5 per cent on the $300,000 second mortgage, not presently, but when, if and as the same is paid to the plaintiffs. Long, Postley and Gross claim one commission jointly, but they assert that they are entitled to $58,750, being 5 per cent on (a) $500,000 cash paid, (b) on the $300,000 second mortgage and (c) on $375,000, the amount of the first mortgage, the whole of which commission is claimed to be now payable and no part of it subject to any postponement.

The plaintiffs' position is that they are liable for one commission only, that the amount presently due is 5 per cent on the cash received, or $25,000, that they never contracted with the Long-Postley-Gross group to pay a commission upon any other basis, and that they did not agree with any one to pay a commission on the amount of the first mortgage at any time, or upon the amount of the second mortgage except as the same might be paid to them in cash.

The theory of the defendants, Long, Postley and Gross, as now advanced, though not so stated in their answer, is that their contract with the plaintiffs was independent and entirely different, not only different in the amount of the commission and manner of payment but different in that the plaintiffs bound themselves to pay them, Long, Postley and Gross, a commission of $58,750, entirely without regard to whatever liability the plaintiffs may have incurred to Vance. They do not go quite so far as to contend that the plaintiffs bound themselves to pay them a commission without regard to whether or not they were the brokers who effected the sale. What their contention, as I understand it, amounts to is that the plaintiffs' representative (Loesche) in an interview with Long and Gross recognized that they had produced Franklin as the purchaser and agreed, if the sale was consummated, to pay them a commission of $58,750 independently of any contract which the plaintiffs might have had with any other broker.

I do not think that the position of this group of defendants is sustained by the evidence, and I am convinced that the plaintiffs never promised any broker to pay him a commission except conditionally upon his having been the one who actually effected the sale.

The testimony of Loesche is that the interview at which these defendants allege that an unconditional promise to pay them a commission which would amount to $58,750 was made never took place. It is not necessary to resolve the issue of veracity upon this point between Loesche on the one hand and Long and Gross on the other. Even if it be assumed (and I shall so assume, without so deciding) that the interview took place exactly as Long and Gross testified it did, what Loesche said will not rightly bear the interpretation that he either intended to bind or did bind the plaintiffs to any such proposition as the defendants now assert he agreed to.

Let us first examine the probabilities, taking as a basis the defendants' own testimony and documentary evidence produced by the plaintiffs. Long and Gross fixed the date of the interview as not earlier than the first week of October, 1943. Not more than two weeks before this, Bolles, who controlled Franklin, had come to Philadelphia with Vance, had made an inspection of the shipyard in company with Vance and Downs, its president, and, on September 30, had submitted a definite offer to buy the yard on terms which, with some modifications, proved satisfactory to the plaintiffs and were subsequently accepted by them. Downs promptly wrote Loesche, enclosing Bolles' written and signed offer and stating that Vance had brought Bolles to Philadelphia. Thus Loesche, when Long and Gross came in to see him, knew that a prospective purchaser introduced by Vance had made a firm offer to buy the shipyard on terms which must have seemed at least decidedly interesting. It is plain from the testimony of Long and Gross that, up to that time, neither of them had ever mentioned Franklin Machine and Foundry Company or Bolles to him. Long and Postley had been working hard to consummate a sale to Wilson and, whatever Gross had been doing, he had not informed the plaintiffs that he had had any contact with Franklin.

Under these circumstances it is almost inconceivable that Loesche, without making any inquiry whatever as to what Long and Gross had done toward interesting Bolles in the property (and the testimony does not suggest that he made any), could have intended to bind the plaintiffs unconditionally to pay these defendants a commission on the sale and, not only that, but to pay them one $18,750 larger than that for which the plaintiffs could have been held liable to Vance.

As to what was actually said, Gross' testimony is as follows: "Well, I told Mr. Loesche that my buyer for this proposition was Mr. Bolles and Mr. Blass, Chester Bolles and Andrew Blass, * * * and I told Mr. Loesche that * * * I felt that if I got him a price satisfactory to him I was entitled to five per cent of the full purchase price without any deductions for any mortgage that might be against the property or any other encumbrances. Well, Mr. Loesche said: If you get me a price satisfactory to me, it is satisfactory to me to pay you the five per cent commission."

Long's version is: "he (Gross) told Mr. Loesche that he understood that these people, Bolles and Blass, were about to buy this property, and 'if they did he claimed a five per cent commission. * * * Mr. Loesche said if his people bought the property, he would get the commission. * * * I told him (Loesche) Mr. Gross had secured this purchaser, the Franklin Machine and Foundry Company; * * * I told him that Mr. Gross was working with me and Mr. Postley. * * * Mr. Gross said that he expected to get a five per cent commission on the selling price. Mr. Loesche told him that if he got a satisfactory price, I think that was the word that he used, from these people, Mr. Gross would get the commission."

One point to be noted in connection with their testimony is that Long and Gross at this time were obviously under the erroneous impression that the entire price was to be paid by Franklin in cash upon the transfer of the stock—an impression which undoubtedly colored their interpretation of Loesche's words.

It takes language more definite and unequivocal than this to be construed as a deliberate and unconditional assumption by a vendor of an obligation to pay a commission which might turn out to be a duplication of one for which he was already liable, and I do not so construe it. Assuming that the interview took place, the only natural and reasonable interpretation of what Loesche said was that Long and Gross, just as any other broker, would receive a commission if they were the ones who effected the sale.

How did Long and Gross understand what had been said? In their answer to the interpleader they say: "Plaintiff entered into an agreement with the defendant, Michael R. Gross, agreeing to pay him a commission of 5% on such price as it would accept for the stock of the Kensington Shipyard and Drydock Corporation if it would effect a sale thereof to a customer procured by him."

On November 4 Gross sent Loesche a telegram containing the following: "* * * This is to advise" (not remind) "you that as a co-broker with Mr. James A. Wilson of New York City, representing you, that I introduced and submitted this proposition to Mr. Bolles, and I have an agreement that I am to receive a commission for said introduction."

On November 3 Long wrote to the plaintiffs referring to Bolles and saying: "We are informed that you are now about to complete the sale of the stocks to this syndicate and that Mr. Vance is claiming the commission of 5% which you have agreed to pay." One would expect Long to remind the plaintiffs of the independent contract which he testified he had for a commission upon the sale to Bolles (Franklin). No such suggestion appears in this letter. On the contrary, he suggests no basis for his claim other than a chain of introductions beginning with Wilson and Harder who was financing Wilson, then going through Harder to Bolles, Bolles to Vance and Vance to "a Pittsburgh Syndicate" which he understands to be the purchaser. Going on, he says: "Mr. Wilson advised us that the aforesaid syndicate has had no experience in operating a shipyard and probably cannot qualify as such with the War Shipping Administration, Maritime Commission." There is a great deal in the letter about his efforts to sell to Wilson. Then he says: "Under the facts set forth in this letter" (not on the basis of any unconditional agreement which you made) "we believe we are legally entitled to the commission on your presently contemplated sale * * *".

Enough has been said, I think, to make it perfectly obvious that whatever Loesche said, or did not say (a) he never in words expressly assumed the liability with which the defendants are now trying to charge him, (b) he never intended to and (c) the defendants never understood that he did; and I so find.

The foregoing findings leave the case as follows: The plaintiffs may be liable to Vance for $25,000 now and another $15,000 payable when, if and as the second mortgage is paid off, or, they may be liable to Long, Postley and Gross in the same

amounts and in the same way. To which group they are liable depends upon which effected the sale. They are not liable to both. They are not under any independent liability to Long, Postley and Gross for that or for a larger amount and the claim of these defendants in respect of both the independent character and the amount of such liability is wholly without substance.

■ If this action were governed by the provisions of Rule 22(2), much of the foregoing would have been unnecessary, because the Rule provides that it is not ground for objection "that the plaintiff avers that he is not liable in whole or in part to any or all of the claimants." Rule 22(1). In this, the basis for relief under the Rule is broader than that under the Interpleader Act of 1936, 28 U.S.C.A. § 41(26), for the provision above quoted does not appear in the statute.

■ However, this Court can not entertain this action as one under the Rules, because the jurisdictional basis of complete diversity between the plaintiffs and the defendants is not present. The plaintiffs are citizens of Pennsylvania as are all the defendants except Gross, who is a citizen of New Jersey. An action under Rule 22 is like any other civil action based on the diversity jurisdiction of the federal courts, and the ordinary rules of jurisdiction govern. See Moore's Federal Practice, Section 22.03, page 2198.

■ The Statute, on the other hand, provides that the District Courts shall have jurisdiction "if two or more adverse claimants, citizens of different States, are claiming to be entitled to such money or property," etc. This provision of the Statute has been held to confer jurisdiction where one claimant, or group of claimants, is a citizen of one state and a second claimant is a citizen of a different state, without regard to the fact that the plaintiff in the interpleader is a citizen of the same state as one of the claimants. Treinies v. Sunshine Mining Co., 308 U.S. 66, 60 S.Ct. 44, 84 L.Ed. 85. It has also been held to confer jurisdiction in a case where there were three adverse claimants, two of whom were citizens of the same state and the third a citizen of a different state, the plaintiff having common citizenship with the former. Cramer v. Phœnix Mut. Life Ins. Co., 8 Cir., 91 F.2d 141. In the present case there are three claimants claiming

jointly on the one hand against a single claimant on the other. There is common citizenship between the latter and two of the three joint claimants but not the third.

In the Cramer case, supra, the Circuit Court of Appeals discussed the decision of the Supreme Court in Dugas v. American Surety Co., 300 U.S. 414, 57 S.Ct. 515, 81 L.Ed. 720. The latter case was one in which there were a large number of claimants, citizens of different states, and the Court, still referring to the Dugas case, said [91 F.2d 146]: "It appeared affirmatively that there was not complete diversity of citizenship among the adverse claimants, nor was there diversity of citizenship between the interpleader and all the adverse claimants. There was, however, diversity of citizenship between two or more of the adverse claimants, and it could only have been on that basis that the jurisdiction of the District Court was sustained."

■ Unless it was presented in the Dugas case, supra, the precise jurisdictional situation appearing in the present case has not, so far as I know, come before any court in an interpleader proceeding, in any reported case. It may therefore be that in taking jurisdiction in this case I am going beyond any case so far decided, but it appears to me that there is nothing that stands in the way of so doing. On the contrary, to do so is in accord with the trend of decisions which have been gradually removing obstacles in the way of the development of the very desirable and beneficial remedy which interpleader practice under the Statute affords.

The defendant Gross, a citizen of New Jersey, claims to be entitled to the fund, albeit his claim is made jointly with two citizens of Pennsylvania, and his claim is obviously adverse to that of the defendant, Vance. The situation is, therefore, covered by the ordinary meaning of the words of the Statute, "two or more adverse claimants, citizens of different States."

■ I do not think that this interpretation of the Interpleader Act renders it unconstitutional. The Courts, in interpreting the Judiciary Act, which is written in substantially the same language as the constitutional grant of diversity jurisdiction to the federal courts, have held that it required that the parties be lined up according to their interest and that there be complete diversity between them. How-

ever, "constitutional language may properly be given a wider interpretation than statutory language. Since the Constitution has a broader purpose than a statute and is intended to last for much longer time, its wording should possess a flexibility which is not needed in a statute," Chafee, Fed. Interpleader, Yale Law Journal, Vol. 49, page 395. The courts have long exercised a jurisdiction in the case of separable controversies and ancillary suits which would clearly violate the constitutional grant if it were interpreted with the same strictness as the Judiciary Act. The Supreme Court adverted to this question in Treinies v. Sunshine Mining Co., supra, and expressly declined to decide it because it was not essential to the decision of that case.

■ Since this action can be maintained only under the Statute, it is essential to determine whether the claim advanced by the defendants, Long, Postley and Gross, has any substance beyond the liability admitted in the complaint. If it has, then the plaintiffs would have an interest in the subject matter adverse to one of the defendants and would be in the position of a plaintiff who "avers that he is not liable * * * in part to (one)" of the claimants. That would not defeat his action under the Rule because of its broader scope, but it might well do so under the Statute. Of course, the broad provisions of the Rule cannot be engrafted upon the Interpleader Act because, to do so, would be to extend the jurisdiction of the federal courts, a result which the Rules expressly exclude. See Rule 82.

■ It is well understood that interpleader is an action conducted in two stages. First, the court must take evidence and determine whether the plaintiff is entitled to interplead the defendants. This is the issue upon which testimony has been taken and which is now before the Court. The second stage is between the different defendants on their adverse claims. See Turman Oil Co. v. Lathrop, D.C., 8 F.Supp. 870.

■ In this case the issue tried turned upon whether the claim of Long, Postley and Gross is actually a claim for an amount greater than that admitted by the plaintiffs. That question was not settled merely because what looks like a claim was set up by them in their answer. The Court must hear evidence and determine whether there is in fact and substance such a claim, and decide, even in the face of conflicting evidence, whether the basis for interpleader, i.e., a single liability in respect of two claims, exists, Dee v. Kansas City Life Ins. Co., 7 Cir., 86 F.2d 813.

■ The Court has heard the evidence and resolved the issue against those defendants. It appears, then, that the plaintiffs are disinterested stakeholders, that no independent liability exists and that there is no claim of any substance as to which the plaintiffs dispute their liability in whole or in part. The plaintiffs are, therefore, entitled to maintain their bill of interpleader upon depositing with the clerk a bond in the amount of $15,000 to secure any additional liability to which they may be subjected in the future.

The defendants have cited Boice v. Boice, 3 Cir., 135 F.2d 919, 920, against the jurisdiction. It is not in point. In the per curiam opinion the Court said: "this is a case of a bill in the nature of a bill of interpleader in which the plaintiff has an active controversy with respect to the subject matter of the suit with one of the defendants." As has been pointed out in the foregoing opinion, the present case has ben resolved by the findings of the Court as a strict bill of interpleader. The complaint does not suggest anything else. While a controversy between the stakeholder and one of the claimants was attempted to be raised by the answer, the Court has found that such controversy is neither real nor substantial and does not in fact exist.