Dorothy S. McKEITHEN, Individually and on behalf of her Deceased husband, Charles S. McKeithen,

v.

The S. S. FROSTA and the M/V GEORGE PRINCE et al.

In the Matter of A/S J. LUDWIG MOWINKELS REDERI, as owner of the M/T FROSTA, petitioning for exoneration from or limitation of liability.

In the Matter of the DEPARTMENT OF HIGHWAYS, STATE OF LOUISIANA, ex rel. William J. GUSTE, Jr., Attorney General, as owner of the M/V GEORGE PRINCE, petitioning for exoneration from or limitation of liability.

Civ. A. Nos. 76–3251, 76–3275 and 76–3654.

United States District Court, E. D. Louisiana.

March 10, 1977.

See also, D.C., 426 F.Supp. 307.

Daniel E. Becnel, Jr., Reserve, La., Joel T. Chaisson, Destrehan, La., Eldon E. Fallon, A. Remy Fransen, Jr., New Orleans, La., James A. George, Baton Rouge, La., Salvador E. Gutierrez, Jr., John R. Martzell, New Orleans, La., for plaintiffs.

Francis J. Mooney, Jr., New Orleans, La., for New Orleans—Baton Rouge, Steamship Pilots Association and Nicholas F. Colombo.

Walter Carroll, Jr., Charles F. Lozes, Benjamin W. Yancey, New Orleans, La., for S. S. Frosta and A/S J. L. Mowinckels Rederi.

John P. Hammond, John R. Peters, Jr., Henry J. Read, New Orleans, La., for the M/V George Prince.

Nigil Rafferty, New Orleans, La., for Southern American Ins. Co.

Donald Ensenat, New Orleans, La., for Department of Highways, State of Louisiana.

## OPINION WITH RESPECT TO INSURANCE POLICY ISSUED BY SOUTHERN AMERICAN INSURANCE COMPANY

ALVIN B. RUBIN, District Judge:

A number of interrelated motions raise as a primary issue the extent of the policy coverage provided by Southern American Insurance Company (Southern American) to its insured, the Department of Highways of the State of Louisiana, owner of the ferry M/V George Prince, with respect to claims arising out of the October 20, 1976 collision between that ferry and the Norwegian tanker, the M/T Frosta. Two days later the owner of the M/T Frosta petitioned this court for exoneration from or limitation of liability pursuant to 46 U.S.C. §§ 181–189 and Rule F, Fed.R.Civ.P. On November 22, the Department of Highways of the State of Louisiana (Department of Highways) filed a similar proceeding as owner of the M/V George Prince. In accordance with the statute, and without a hearing, the court enjoined the filing of any actions against the vessels and their owners. However, in accord with *Olympic Towing Co. v. Nebel Towing Co.*, 5th Cir. 1969, 419 F.2d 230, cert. denied 397 U.S. 989, 90 S.Ct. 1120, 25 L.Ed.2d 396, direct actions against the underwriters filed in this court were excepted from the restraining order.

Subsequently Southern American intervened in the limitation action of the Department of Highways, seeking a declaratory judgment and interpleader, and praying for a determination, binding on all parties, that its liability under its policy insuring the Department of Highways cannot exceed the sum of $300,000 in respect of all claims resulting from the collision. The individual claimants and the Department of Highways contend that the policy provides coverage of $300,000 per claimant, or alternatively, its amount can not be determined without extrinsic evidence; hence that an interpleader is improper. The court ordered Southern American to file a motion for summary judgment in all proceedings growing out of this collision including the direct actions against it and the limitation action of the Department of Highways, seeking a determination that the policy on its face is limited to coverage of $300,000.[1] By this procedure all parties would be afforded a hearing on the issue. If it were determined that the policy coverage as a matter of law is only $300,000, based on the face of the policy, the objections to the interpleader procedure would be ill-founded. If, on the other hand, it was decided that the policy

---

1. The motion also seeks an order restraining all claims against Southern American in excess of $300,000.

provided coverage in some other amount, or that additional evidence was needed, the course of future proceedings in all related actions could then be determined.

I

■ For reasons indicated by the Court at prior oral argument, there is some doubt whether interpleader is permissible where there is a real dispute concerning the amount of the stake or fund to be deposited. *United Artists Corp. v. Fields Productions, Inc.*, S.D.N.Y.1973, 363 F.Supp. 903; *Connecticut General Life Insurance Co. v. Yaw*, W.D.N.Y.1931, 53 F.2d 684; Cf., Wright & Miller, Federal Practice and Procedure, § 1716, at 457; *Girard Trust Co. v. Vance*, E.D.Pa.1946, 5 F.R.D. 109. However, because the issue of policy coverage is now raised concurrently by a motion for summary judgment, the Court may determine the scope of coverage if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56, Fed.R.Civ.P.[2] If the contract is sufficiently clear to lend itself to interpretation on its face, as a matter of law, no party is prejudiced by its concurrent interpretation for purposes of the declaratory judgment and interpleader.[3]

■ A policy of marine insurance is a maritime contract, but the policy in this case does not insure a blue water peril; it covers a ferry boat plying the internal waters of a state from one side of the river to another. Both parties agree the contract is sufficiently local to warrant application of state law as required by *Wilburn Boat v. Fireman's Fund Ins. Co.*, 1955, 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337.[4] The first inquiry before this Court, then, is whether under Louisiana law, there is a genuine issue of material fact as to the scope of policy coverage.

II

The policy at issue reads in relevant part: "Amount hereby insured $300,000.00

\*   \*   \*   \*   \*   \*

In consideration of the premium and subject to the warranties, terms, and conditions herein mentioned, this Company hereby undertakes to pay up to the amount hereby insured . . . such sums as the assured . . . shall have

---

**2.** The Plaintiffs' Committee cites several cases for the proposition that summary judgment must be denied and the case submitted to the jury wherever reasonable men could reach different conclusions and inferences from the same facts. *Croley v. Matson Navigation Co.*, 5th Cir. 1970, 434 F.2d 73, 75; *Pierce v. Ford Motor Co.*, 4th Cir. 1951, 190 F.2d 910, 915. These cases were negligence actions and the motions raised the question of whether or not there had been negligence; because that issue can rarely be determined with certainty without considering testimony and the inferences to be drawn from it, summary judgment is generally inappropriate. Although courts must be cautious about short-circuiting trial regardless of the nature of the action, cases involving construction of contracts or insurance policies, where the court decides that, as a matter of law, extrinsic evidence is inadmissible, are appropriately resolved by summary procedure. *Douglas Equipment Co. v. Hartford Accident & Indem. Co.*, 7th Cir. 1970, 435 F.2d 1024, 1028.

**3.** The Advisory Committee on Admiralty Rules in 1960 thought, "The summary judgment and the declaratory judgment are generally regarded . . . . as valuable in admiralty as well as in civil cases." Moore, Federal Practice, 56.-

17[3.–1], note 2. Since the extension in 1966 of the Civil Rules to cases of admiralty, Rule 56, Fed.R.Civ.P. provides for summary judgment, and Rule 57, Fed.R.Civ.P. provides for declaratory judgments in admiralty proceedings.

According to Wright & Miller, Federal Practice and Procedure, § 2732, "[A]ll civil actions that come before the court on a Rule 56 application—complex or simple important or unimportant—are subject to the same standard; summary judgment will be granted when 'there is no genuine issue as to any material fact . . . the moving party is entitled to a judgment as a matter of law.'" Declaratory judgments have commonly been used to interpret the insurance policies. Wright & Miller, § 2760.

**4.** The Court in *Wilburn Boat*, supra, 348 U.S., at 320–321, 75 S.Ct., at 374, held, "Under our present system of diverse state regulations, which is as old as the Union, the insurance business has become one of the great enterprises of the Nation. Congress has been exceedingly cautious about disturbing this system, even as to marine insurance where congressional power is undoubted. We, like Congress, leave the regulation of marine insurance where it has been—with the States."

become legally liable to pay and shall have paid on account of:

Loss of life of, or injury to, or illness of, any person;

Loss of, or damage to, or expense in connection with any fixed or movable object or property of whatever nature;

\* \* \* \* \* \*

Costs and expenses incurred with this Company's approval, of investigating and/or defending any claim or suit against the assured arising out of a liability or an alleged liability of the assured covered by this policy.

\* \* \* \* \* \*

Liability hereunder in respect of loss, damage, costs, fees, expenses, or claims arising out of or in consequence of any one occurrence is limited to the amount hereby insured. (For the purpose of this clause each occurrence shall be treated separately, but a series of claims hereunder arising from the same occurrence shall be treated as due to that occurrence.)"

The State of Louisiana and the Plaintiffs' Committee contend that, while the policy unambiguously provides $300,000 for each "occurrence", each death or injury constitutes one occurrence, so that a separate $300,000 is provided for the claim with respect to each victim. Additionally, and regardless of how the court rules on their first contention, these parties also contend that any costs of investigation and defense incurred by Southern American in connection with claims asserted against it, as opposed to the insured, or incurred in prosecuting its interpleader, are not subject to policy limits, and must be paid in addition to whatever liability Southern American may have under the terms of the policy.

■ Words and phrases employed in a contract of insurance must be construed, in their ordinary and popular sense, rather than in a technical, philosophical or limited sense.[5] *Hendricks v. American Employers Ins. Co.*, La.App.1965, 176 So.2d 827, 830. See also *Levy v. Duclaux*, La.App.1975, 324 So.2d 1, 10; *Thomas v. Protective Life Ins. Co.*, La.App.1975, 319 So.2d 878, 880; *Schwegmann Bros. Giant Super Markets v. Underwriters at Lloyd's, London*, La.App. 1974, 300 So.2d 865, 868, application denied 303 So.2d 172; *Atlas Lubricant Corp. v. Federal Ins. Co. of New Jersey*, La.App. 1974, 293 So.2d 550, 552.

■ The policy makes it clear that "a series of claims" can arise from one "occurrence". The term "occurrence" standing alone might refer to each death or injury. But that word is not used in isolation in the contract. The policy expressly refers to "claims arising *out of or in consequence of any one* occurrence." (Emphasis supplied.) This makes it evident that the clause is intended to include all claims arising out of a single event, that is all damages claimed to have been caused by that event. Doubtless after the collision of the M/T Frosta and the George Prince a myriad of events happened: individuals aboard the ferry sought to escape, the ferry and the automobiles aboard it sank, most of the passengers and crew were drowned and a few may have died in some other manner, a few were injured and escaped. But no one or all of these is a separate "occurrence" as that term is used in the policy clause already quoted.

■ Plaintiffs argue that the policy by its express terms covers "loss of life of, or injury to, or illness of, *any person*," (emphasis supplied), and that use of the singular indicates an intent to provide $300,000 to any one person as opposed to a group of persons.[6]

---

**5.** Webster's Third New International Dictionary defines "occurrence" as "something that takes place; something that happens unexpectedly and without design."

**6.** In conjunction with this argument, plaintiffs point out that the word "occurrence" is not employed in the portion of the contract that

details the items that are covered. The words appears later in the policy following a litany of items including "loss, damage, costs, fees, expenses or claims", which, arising out of or in consequence of any one "occurrence" will be limited to the amount insured. Plaintiffs contend that, because this later clause does not recite, as, for example, the deductible clause

But the policy does not provide coverage of $300,000 for "each" person. The insurer undertakes to pay the amount insured ($300,000) for loss of life, injury or illness to "any" person. Subsequently it limits its liability for all loss, damage, costs, fees, expenses and claims arising out of or in consequence of any one occurrence to the amount insured, or $300,000. Hence, the company may be liable for any sum up to $300,000 for losses sustained by any one person, but, if more than one person sustains damage aggregating over $300,000, the company is not liable for more than $300,000.

### III

This interpretation is consistent with the jurisprudence defining the term "occurrence" in other insurance contracts issued in Louisiana. In *Anchor Casualty Co. v. McCaleb*, 5th Cir. 1949, 178 F.2d 322, an oil well blew out of control for approximately fifty hours. Considerable quantities of oil and gas distillate, sand and mud, were blown into the air and carried by the wind onto the properties of landowners and tenants, not at a single moment but continuously over a period of more than two days. Each hour, indeed, each minute, more oil and gas were blown, and, in consequence, more damage was sustained. The court ruled, "The blowing-out of the well was not a single accident but a series of events, a catastrophe. Numerous accidents were the product of this motivating force and the wind as a supervening force." 178 F.2d, at 324. The court continued, "The wording 'each accident,' as used in the policy, must

be construed from the point of view of the person whose property was injured . . . If one cause operates upon several at one time, it cannot be regarded as a single incident, but the injury to each individual is a separate accident. Couch, Cyclopedia of Insurance Law, Vol. 5, p. 4136." 178 F.2d, at 324–325. Although the last sentence taken alone would appear to consider each individual loss as a separate occurrence, that one expression cannot be taken from context to establish a rule of law. In *Anchor Casualty* the court was concerned with a series of eruptions. One individual might be damaged by the first eruption; and then damaged again by later events. Another individual, in another location, might be damaged by a wholly different discharge minutes or hours later. Moreover, the court in *Anchor* applied the aggregate limit of $25,000 to all damage sustained as a result of the blow-out, and merely refused to apply the $4,000 limit "per accident" to all damage sustained. Here plaintiffs contend that each injury ought to be compensated to the extent of the aggregate coverage.

The Fifth Circuit subsequently recognized that its holding in *Anchor Casualty* ought to be limited to an accident involving a series of events causing discrete damage in different places and at different times. *St. Paul Mercury Indemnity Co. v. Rutland*,[7] 5th Cir. 1955, 225 F.2d 689, involved the collision of a train and truck resulting in damage to sixteen railway cars and their contents. The court stated:

> We think the opinion [in *Anchor Casualty* was based on circumstances] not at all

does, that the language of the insuring agreement is subordinated to it (i. e. "notwithstanding the forgoing"), it cannot modify those prior portions of the insuring agreement. However, the Court is not aware of any rule of construction that requires later clauses to state explicitly that they are in derogation of prior terms in order to effectively modify those terms. Rather, "The court will, if possible, give effect to all parts of the instrument, and a construction which gives a reasonable meaning to all of its provisions will be preferred to one which leaves a portion of the writing useless or inexplicable." *Peavy-Byrnes Lumber Co. v. Long-*

*Bell Lumber Co.*, W.D.La.1944, 55 F.Supp. 654, 659, aff'd 150 F.2d 49, 5 Cir.; *Swift Refrigerator Transportation Co. v. International Molasses Co.*, La.App.1913, 10 Orleans App. 117. It is only if the conflict is irreconcilable that the first of two inconsistent paragraphs is given priority over the latter. *Peavy-Byrnes Lumber Co.*, supra, 55 F.Supp. at 659. For reasons indicated in the text, such a reconciliation is possible here.

7. Although *Rutland* involved application of Georgia law, did not affect the Court's basis for distinguishing and limiting *Anchor*.

comparable to the single, sudden collision with which we are concerned here * * We are convinced that the language in *Anchor* to the effect that a separate accident occurs with respect to each owner of damaged property was not necessary in the opinion. We believe that the conclusion was based upon the court's appreciation of the policy provisions as applied to those facts, and accordingly we do not consider the opinion dispositive of the single, sudden and unintentional collision involved here was one accident, and the insurer's liability for all property damage resulting therein is $5,000.00.

225 F.2d at 693.

See also *Maurice Pincoffs Co. v. St. Paul Fire and Marine Insurance*, 5th Cir. 1971, 447 F.2d 204, 206–207, applying Texas law and treating eight sales of contaminated bird seed as separate events because each injury was the result of a distinct cause, rather than because each injury was a distinct result.

When the Louisiana Supreme Court adopted the reasoning of *Anchor Casualty*, in *Lombard v. Sewerage and Water Board of New Orleans*, 1973, La.App., 284 So.2d 905, 916, it did so in circumstances approximating those in *Anchor*, as contrasted with those involved here. In *Lombard*, a pipe-laying project down the center of a street for several blocks continued for more than a year; in the process various houses were damaged at different times. The court noted, "When the word 'occurrence' is substituted for 'accident', as here, the intention manifested by this change is to broaden coverage." 284 So.2d at 915.[8] It continued:

---

**8.** The policy itself provided "The term 'occurrence' is substituted for 'accident' wherever else it appears, . . . Occurrence means either an accident or continuous or repeated exposure to conditions which results during the policy period in injury to person or real or tangible property which is accidentally caused. All damages arising out of exposure to substantially the same general conditions shall be considered as arising out of one occurrence."

**9.** In *Lou-Con, Inc. v. Gulf Building Services*, La.App., 4th Cir. 1973, 287 So.2d 192, writ

---

. . . we think it more logical to view this project as a series of 'occurrences' resulting in damages during the course of this prolonged undertaking. The word 'occurrence' as used in the policy must be construed from the point of view of the many persons whose property was damaged . . . Notwithstanding, therefore, that the same *causes* may have operated upon several properties at the same time resulting in varying degrees of damage, it cannot be regarded as one occurrence, but the damage to each plaintiff is a separate occurrence.

284 So.2d, at 915–916. (Emphasis supplied).

Thus, where several "causes" affected different properties at the same time, the damage to each was a separate occurrence. The court did not suggest that, where *one* cause operates simultaneously on several properties, the damage to each is a separate occurrence. Moreover, *Lombard* apparently involved a situation where it would be difficult to determine what distinct damage, if any, was caused by each event in a series of events. The court was not concerned with the problem presented here and in *Rutland*: a single, sudden collision.

Although no Louisiana cases have considered the issue in the circumstances of a single collision,[9] in other jurisdictions, "The trend of authority definitely is toward the adoption of the viewpoint that the limitation provision provides for a maximum of liability for all injuries and damages proximately resulting from one uninterrupted and continuing cause." Annotation: Liability Insurance—Each Accident, 55 A.L.R.2d 1300, 1303. See also *Denham v. La Salle-Madison Hotel Co.*, 7th Cir. 1948, 168 F.2d

---

denied, 290 So.2d 899, and 290 So.2d 901, the court held that all property damage resulting from the setting of a fire constituted "one occurrence". However, the policy itself defined "occurrence" as an event that could necessarily involve more than one person: "The total liability of the company for all damages because of all property damage *sustained by one or more persons* or organizations as the result of one occurrence. . . ." (Emphasis supplied). Accordingly the case is not relevant to the issue here.

576 (hotel fire damaging property of 250 guests over seventeen hour period is "one occurrence or catastrophe"); *Tri-State Roofing Co. v. New Amsterdam Cas. Co.*, W.D.Pa.1955, 139 F.Supp. 193 (fire spreading to eleven properties is "one accident"); but cf., *Liberty Mutual v. Rawls*, 5th Cir. 1968, 404 F.2d 880 (automobile striking two automobiles 2 to 5 seconds and 30 to 300 feet apart constitutes two accidents).

Those cases that have found more than one "accident" or "occurrence" have not involved multiple effects resulting from a single cause, but have involved several causes, or a single continuing cause that recurs at a different time (though the interval between events may be small) and in a different place. Every case cited to the court or found by it involving a single cause resulting in immediate damage to a variety of persons or objects has held that there has been only one occurrence or accident. Accordingly, the jurisprudence as well as the language of the policy requires the catastrophe to be treated as one occurrence for purposes of the policy.

### IV

Alternatively, the parties opposed to Southern American contend that the policy is ambiguous and "[i]n case of ambiguity, the policy provisions are construed most favorably to the insured and against the insurer. Of the permissible constructions, the courts adopt that which effectuates the insurance over that which defeats it." *Snell v. Stein*, 1972, 261 La. 358, 362, 259 So.2d 876, 878, citing *Creole Explorations, Inc. v. Underwriters at Lloyd's, London*, 1964, 245 La. 927, 161 So.2d 768; *Schonberg v. New York Life Ins. Co.*, 1958, 235 La. 461, 104 So.2d 171; *Stanley v. Cryer Drilling Co.*, 1948, 213 La. 980, 36 So.2d 9.[10] But

Justice Tate went on to say in the *Snell* opinion, 259 So.2d at 878:

On the other hand, in the absence of conflict with statute or public policy, insurers have the same right as individuals to limit their liability and to impose whatever conditions they please upon their obligations. In such event, unambiguous provisions limiting liability must be given effect. *Monteleone v. American Employer's Insurance Co.*, 1960, 239 La. 773, 120 So.2d 70; *Hemel v. State Farm Mutual Ins. Co.*, 1947, 211 La. 95, 29 So.2d 483; *Muse v. Metropolitan Life Ins. Co.*, 1939, 193 La. 605, 192 So. 72, 125 A.L.R. 1075.[11]

It is evident from what has already been said that this court does not consider the insurance policy ambiguous. Certainly it is difficult to read. But "ambiguity" means susceptible of more than one rational interpretation, and it does not connote clarity sufficient to permit running reading. This policy, carefully read, means only thing. Accordingly, there is no need to resort to a rule, even if it were applicable, that would supplant the common intent of the parties with a particular substantive result.

■ The State has repeatedly offered evidence concerning the reserves set up by Southern American, suggestions that it may have reinsured its risk in whole or in part, and arguments that these together with the manner in which Southern American has handled the claims on its own books create a genuine issue of material fact. If the policy were ambiguous such extrinsic evidence might be relevant to a determination of coverage. But the policy is sufficiently clear to bar all extrinsic evidence. Irrelevant evidence is by definition immaterial

---

10. La.Civ.Code Art. 1957 provides:

 In a doubtful case the agreement is interpreted against him who has contracted the obligation.

 La.Civ.Code Art. 1950 provides:

 Where there is anything doubtful in agreements, we must endeavor to ascertain what was the common intention of the parties, rather than to adhere to the literal sense of the terms.

11. More recently, in *Fee v. Vancouver Plywood Co., Inc.*, La.App.1976, 331 So.2d 151, 155, the Louisiana Court of Appeal held that, notwithstanding the fact that provisions of a contract are ambiguous, such provisions are not per se to be construed against the party preparing the contract, but instead the ambiguity be resolved from the common intent of the parties. (Per Guidry, J., with one Judge concurring and one Judge concurring in decree).

and a proffer of it does not create an issue of material fact. See Rule 56, F.R.C.P.

## V

The final issue is whether fees and expenses incurred by the insurer in investigating and defending claims asserted against it under the Louisiana direct action statute, La.R.S. 22:655, or resulting from actions initiated by the insurer, such as the interpleader, may be credited toward the policy limit of $300,000. The relevant policy language has been quoted in part II of this opinion.

This language and the arrangement of subordinate clauses make it clear that all costs incurred by the insured, Department of Highways, in investigating and defending claims arising out of the collision are subject to the $300,000 aggregate limit, for the policy specifically provides, "Liability in respect of . . . costs, fees, expenses . . . arising out of or in consequence of any one occurrence is limited to the amount insured." But the policy does not mention the costs separately incurred by Southern American in defending direct actions arising out of the collision, or incurred in prosecuting actions initiated by Southern American, such as the intervention and interpleader.

In construing a policy similar to the one presented here, in *Board of Commissioners of the Port of New Orleans v. M/V Rachael Guidry*, E.D.La. 1977, 425 F.Supp. 661, this court held, "Whether the insurer reimburses the insured, or incurs the costs of defense directly, is not a controlling consideration"; the insurer was entitled to credit the policy limits with defense costs in either instance. But the policy there involved covered all legal expenses incurred in defense of claims against the assured arising out an alleged liability covered by the policy. The court reasoned that, although a suit might name the insured or the insurer as the defendant,

the claim in fact arose out of an alleged liability covered by the policy and thus its defense was authorized by and covered by the express language of the policy. The present policy covers only "such sums *as the assured* . . . shall have become legally liable to pay and shall have paid on account of: * * * costs and expenses . . . of investigating and/or defending . . .". (Emphasis supplied). Costs and expenses incurred directly by the insurer are neither sums that the insured is liable to pay nor that it will pay.

Moreover, while the policy exhaustively states the items for which the insurer is liable, it does not mention costs and expenses incurred directly by the insurer. As stated in the *Rachael Guidry*, "What the insurer spends in connection with an occurrence must be authorized by the policy, or the insurer cannot credit it toward the . . . limit. . . . [A]ny costs incurred for legal fees that are not authorized under the policy may not count toward the limit." [12]

Southern American prosecuted and filed the interpleader on its own initiative. Hence, regardless how the policy is interpreted in other respects, the costs Southern American thereby incurred were not costs of "defending or investigating claims" against the assured arising out of the collision, and ought not be charged against the amount of coverage provided by the policy. As Southern American's motion for summary judgment in the direct action proceedings was a necessary step in securing the interpleader relief it sought, expenses incurred therein also fall outside the scope of policy coverage.

Southern American has indicated that it does not wish to defend the direct actions on the merits. Accordingly, the parties and the court have not considered the issue of whether expenses that would be incurred in the course of such a defense should be cred-

12. Moreover, in the *Rachael Guidry*, the Court noted, "Nor do we deal with the situation where the assured has one lawyer and the insurer had another, so that dual counsel's fees are being sought." In the present case we are concerned with precisely that situation. The insurer is not merely standing in the shoes of the insured, but is representing distinct and often adverse interests.

ited to the amount of coverage, nor is there any need to consider the issue at this time.

## VI

For reasons indicated, the insurer is liable under its policy provisions for only $300,000. Accordingly, it may deposit that sum into the registry of the Court and its motion to interplead will be granted. The motion for summary judgment as to all claims based on the policy at issue in excess of $300,000 is GRANTED. However, expenses incurred by Southern American in seeking the summary judgment in the direct action or in prosecuting its interpleader may not count toward that $300,000 limit, as they arise apart from any liability under the policy. The motion of Southern American for a declaratory judgment fixing its liability under the provisions of the policy at $300,000 is also GRANTED. This liability includes "all loss, damage, costs, fees, expenses, or claims" that the insured "shall  .   .   . become legally liable to pay and shall  .   . pa[y]" as a result of or in consequence of the October 22, 1976, collision between the M/T Frosta and the M/V George Prince. Southern American will prepare a judgment in accordance with this opinion and submit it to all parties for approval as to form.