CARGILL, INCORPORATED, Plaintiff,

v.

LIBERTY MUTUAL INSURANCE
COMPANY, Defendant.

No. Civil 4–76–480.

United States District Court,
D. Minnesota,
Fourth Division.

June 28, 1979.

Timothy W. Regan, Minneapolis, Minn., for plaintiff.

Duane E. Arndt, James R. Gray, Minneapolis, Minn., for defendant.

MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

This matter comes before the Court on the motion of defendant for judgment notwithstanding the verdict or for a new trial. Trial of this action occurred in December, 1978, and primarily concerned the applicability of exclusion (k) in a policy issued by defendant insurer. The jury in a special verdict determined that the exclusion was

inapplicable, and the Court on December 8, 1978, ordered that judgment be entered for plaintiff. On December 18, 1978, defendant filed the instant motion. Oral argument was heard January 9, 1979.

Defendant, Liberty Mutual Insurance Company (Liberty Mutual), issued a comprehensive general liability policy to plaintiff, Cargill, Inc., effective during the events in question. The policy contained a standard exclusionary clause, commonly denominated the "business risk" exclusion:

This policy does not apply:

.        .        .        .        .

(k) to property damage resulting from the failure of the named insured's products or work completed by or for the named insured to perform the function or serve the purpose intended by the named insured, if such failure is due to a mistake or deficiency in any design, formula, plan, specifications, advertising material or printed instructions prepared or developed by any insured; but this exclusion does not apply to property damage resulting from the active malfunctioning of such products or work.

(Pltf. Ex. 26, at 1; End. 1, at 3)    The insured's product in question here is Grits 3500.

Cargill manufactured Grits 3500 as a nutrient medium for use by the pharmaceutical industry. The product had possible application in the vitamin and pet food industries as well. Grits 3500 was an imprecise blend of soybean flours; its ingredients were soy flours found unsuitable for or surplusage to other production processes. Thus, the precise composition of Grits 3500 varied with the amount of ingredients on hand at the time of production. . Cargill concededly warranted, however, the protein content and granulation size of the product.[1]    These features, along with a low

moisture content, were thought by Cargill to be the marketing strengths of Grits 3500.

Beginning in 1968, Abbott Laboratories (Abbott) purchased Grits 3500 in bulk for use in production of erythromycin, an antibiotic. Certain microorganisms introduced in a nutrient medium would grow and produce erythromycin as a byproduct in a fermentation process. The specific production process is proprietary information of Abbott and was not disclosed to Cargill. Cargill was unaware of the identity of the microorganisms, other components of the nutrient medium, and even the antibiotic which Abbott intended to cultivate. Cargill did provide Abbott with product samples and a typical analysis of Grits 3500. (Pltf. Ex. 27)[2]    Abbott was interested in the product primarily as a source of protein; its granulation size was also important. (Testimony of George Proper)

In early 1973, Abbott experienced loss of yield of erythromycin and brought the problem to the attention of Cargill. On November 16, 1972, Cargill had substituted trisodium phosphate as a neutralizing agent in Nutramine, a product used as a calf milk replacement. The substitution was an effort to eliminate an odor that purchasers of Nutramine found unpleasant. The change increased the concentration of phosphorus in Nutramine. Because material rejected in the production of Nutramine was incorporated into Grits 3500, the concentration of phosphorus increased in that product as well. It was the increased level of phosphorus in Grits 3500, not its protein content or granulation size, which caused a reduction in yield of erythromycin by changing the metabolism of the microorganism used as the fermenting agent.

In April, 1974, Abbott claimed expenses in excess of $125,000, in addition to lost profits. (Pltf. Ex. 1)    On May 10, 1974,

| Protein | 52% |
| Fat | 1% |
| Fiber | 3% |
| Moisture | 7% |
| Color | White |

.        .        .        .        .

(Pltf. Ex. 27, at 1)

1.  The name of the product derives in part from the size of its granules, which were to have been fine enough to pass through a No. 34 mesh. The protein content of Grits 3500 was to be relatively high—approximately 50 percent.

2.  The typical analysis did not reveal all of the components of Grits 3500:

Cargill notified Liberty Mutual of the claim. Liberty Mutual denied coverage on January 24, 1975. After negotiations in which Abbott claimed losses as high as $500,000 (see, e. g., Pltf. Ex. 35), Cargill in July, 1975, settled the claim for $100,000. It then commenced this action for breach of contract. Jurisdiction is founded on diversity of citizenship, and Minnesota law applies.

■ The "business risk" exclusion excludes coverage for design, rather than production or installation, defects. See, *Canadian Univ. Ins. Co. v. Fire Watch, Inc.*, 258 N.W.2d 570 (Minn.1977); *Arcos Corp. v. American Mut. Liability Ins. Co.*, 350 F.Supp. 380 (E.D.Pa.1972), *aff'd mem.*, 485 F.2d 678 (3d Cir. 1973); *Dawe's Labs., N.V. v. Commercial Ins. Co.*, 19 Ill.App.3d 1039, 313 N.E.2d 218 (1974), *cert. denied*. The applicability of the exclusion (quoted at page 50 supra) is triggered by its first two clauses, but defused by the savings clause. In this circumstance, applicability is determined by resolution of the following three questions:

1. Did Abbott Laboratories' loss of yield of erythromycin result from the failure of Grits 3500 to perform the function or serve the purpose intended by Cargill?

2. Was the failure of Grits 3500 to perform the function or serve the purpose intended by Cargill due to a mistake or deficiency in any design, formula, plan, specifications, advertising material or printed instructions prepared or developed by Cargill?

3. Did Abbott Laboratories' loss of yield of erythromycin result from an active malfunctioning of Grits 3500?

These questions were put with appropriate instruction to the jury in a special verdict. The jury answered the first interrogatory "No," thereby concluding that the exclusion was inapplicable and pretermitting the other interrogatories.

Liberty Mutual now moves for judgment notwithstanding the verdict or a new trial.

The remedies sought perform different functions and are gauged by different standards. The standards governing the propriety of granting judgment notwithstanding the verdict under Fed.R.Civ.P. 50 are well-settled.

> [T]he trial court . . . [is] (1) to consider the evidence in the light most favorable to the plaintiff[ ] as the part[y] prevailing with the jury; (2) to assume that all conflicts in the evidence were resolved by the jury in favor of the plaintiff[ ]; (3) to assume as proved all facts which plaintiff['s] evidence tends to prove; (4) to give the plaintiff[ ] the benefit of all favorable inferences which may reasonably be drawn from the facts proved; and (5) to deny the motion if, reviewing the evidence in this light, reasonable men could differ as to the conclusions to be drawn from it.

*Polk v. Ford Motor Co.*, 529 F.2d 259, 267 (8th Cir.) (en banc), *cert. denied*, 426 U.S. 907, 96 S.Ct. 2229, 48 L.Ed.2d 832 (1976). A motion for a new trial is broader in the sense that it encompasses more grounds—e. g., evidentiary rulings and instructions—and in the sense that the Court in evaluating the weight of the evidence may apply some independent scrutiny to determine whether a miscarriage of justice has occurred. See, e. g., *Bates v. Hensley*, 414 F.2d 1006, 1011 (8th Cir. 1969).

The chief argument Liberty Mutual advances is that as a matter of law Grits 3500 failed to serve the purpose or perform the function intended by Cargill. Liberty Mutual argues that the purpose of Grits 3500 was to maximize antibiotic yield. Principal reliance is placed on a letter sent to Dan Markey in Abbott's purchasing department by Cliff E. Anderson of Cargill on August 30, 1972. That letter states:

> I am writing to you to explain why soy grits 3500 are used in the pharmaceutical industry instead of standard soy bean meal. Soy grits are widely used as a source of high-quality, low-cost protein for fermentation, and the product which has greatest acceptance has been our soy grits 3500 due to a variety of reasons.

**52**

First of all, grits 3500 are produced in Cargill's completely new soy flour facilities located in Cedar Rapids, Iowa. Because this plant was designed for food products, we are able to exercise maximum quality control, thus assuring uniformity of product from shipment to shipment. This is not the case with soy bean meal.

Secondly, we are able to produce a grit with the absolute minimum of extraneous material. For this reason, grits 3500 is a very clean product. This helps us guarantee a 50% protein level. This is not true with soy bean meal where protein levels vary around the 44% level with the product containing hulls, pods, etc.

Thirdly, 3500 is a specific granulation for the fermenting process where control of this is important.

And fourth, a consistent amount of heat treatment is applied to 3500 to insure more protein in solution for better yields. With regular meal the protein is locked in and is less soluble.

I hope this clarifies the difference between grits 3500 and soy bean meal. (Def. Ex. A) Liberty Mutual contends: "The first three paragraphs of Anderson's letter can only be reasonably interpreted as a statement by Cargill that it intended Grits 3500 as a product particularly suitable for use in the pharmaceutical industry because of its 'uniformity of product from shipment to shipment' and because of its 'absolute minimum of extraneous material.'" (Def. Br. at 5)

■ To a large extent, Liberty Mutual's argument begs the question. It assumes that "uniformity of product" and "extraneous material" refer to phosphorus or excessive phosphorus in Grits 3500. As a whole, however, the letter speaks primarily, if not exclusively, of protein level and granulation size, and these attributes are the more reasonable referents of the phrases on which Liberty Mutual relies. This interpretation is buttressed by the fact that the purpose of Grits 3500 must be viewed from the point of view of Cargill (see exclusion (k), quoted at page 50 supra),[3] which justifiably had little knowledge of the use to which Abbott intended to put Grits 3500. Moreover, Cargill's view of its product is corroborated by the reasons Abbott decided to purchase Grits 3500, as they were testified to by George Proper, the fermentation engineer at Abbott in charge of erythromycin production. In short, the finding of the jury that Abbott's loss of yield did not result from a failure of Grits 3500 to perform the function or serve the purpose intended by Cargill is amply supported by the evidence. Thus, the Court need not consider, just as the jury did not, the other two elements of exclusion (k).[4]

■ At oral argument, Liberty Mutual argued that a jury issue existed as to whether Abbott Laboratories had suffered "property damage" within the meaning of the policy. The policy defines "property damage" to mean "injury to or destruction of tangible property." (Pltf. Ex. 26, at 3) Liberty Mutual characterizes Abbott's dam-

3. This fact makes irrelevant the efforts of Liberty Mutual to analogize representations in the Anderson-Markey letter to express warranties under section 2–313 of the Uniform Commercial Code, Minn.St. 336.2–313.

4. The Court notes that Liberty Mutual appears to have the better position on the remaining issues of the applicability of exclusion (k), assuming that the purpose of Grits 3500 was to maximize antibiotic yield. If Abbott's damage did result from the failure of the product's purpose, it seems clear that the failure arose from a mistake or deficiency in the design or formula of Grits 3500. Cargill's argument that because there was no precise formula for Grits 3500 there can be no deficiency in the formula

is sophistry. Having no design in a situation where the product fails of its intended purpose is itself a design error. Furthermore, the savings clause would not reinstate coverage, since the loss of yield of antibiotic would appear to result from the mere failure of Grits 3500 and not its active malfunctioning. See, *American Employers' Ins. Co. v. Maryland Cas. Corp.,* 509 F.2d 128 (1st Cir. 1975); *Carboline Co. v. Home Indemnity Co.,* 522 F.2d 363 (7th Cir. 1975); *Kyllo v. Northland Chem. Co.,* 209 N.W.2d 629 (N.D.1973); *Pittway Corp. v. American Motorists Ins. Co.,* 56 Ill.App.3d 338, 13 Ill.Dec. 244, 370 N.E.2d 1271 (1977); 1 R. Long, *The Law of Liability Insurance,* § 11.10 (1976); 3 *id.* App. B, § 13.

ages to be loss of profits and, thus, intangible. During trial, the Court ruled as a matter of law that Abbott suffered property damage. The undisputed testimony of George Proper indicates that the increased level of phosphorus in Grits 3500 inhibited the growth of the microorganisms. Certainly, this constitutes injury to tangible property. Liberty Mutual confuses the consequences of this injury—the loss of yield and resultant loss of profits—with the injury itself.

■ Liberty Mutual also seeks a new trial on the ground that the Court erred in excluding Def. Ex. F on the basis of relevance. The exhibit lists prior product liability claims against Cargill which it did not refer to Liberty Mutual. Liberty Mutual asserts that the list evidences Cargill's admission that no coverage existed for the prior claims and that its attempt to claim coverage in the instant case is inconsistent with its previous actions. (Def. Br. at 8–9). The evidence is irrelevant for two reasons. First, the claims listed do not exhibit similarity to the claim Abbott raised against Cargill. Thus, Cargill's assertion of coverage here is not inconsistent with its prior actions. Second, even assuming similarity among the claims,[5] the failure of an insured to submit a claim to an insurer is ambiguous. There are many reasons, apart from a belief that the policy affords no coverage, which may cause an insured to handle a claim itself. It is worthy of note that the great majority of the claims listed in Def. Ex. F. are pressed by individuals for comparatively small amounts. As a matter of customer relations, Cargill might have wished to deal with these types of claims itself. Furthermore, as a matter of practicality, Cargill may not have wished to submit a claim in light of the amounts deductible under the policy.[6]

■ Liberty Mutual's final argument for post-trial relief is that the Court erred in applying the deductible limits of the policy when the issue was raised at the bench in the midst of trial. The policy provides for a deductible of $50,000 per occurrence. (Pltf. Ex. 26, End. 30) "[T]he deductible amount applies under the . . . Property Damage Liability Coverage . . . to all damages because of all . . . property damage as the result of any one occurrence." (*Id.*) "[O]ccurrence means . . . an accident, event or happening, including injurious exposure to conditions, which results, during the policy period, in . . . property damage neither expected nor intended from the standpoint of the insured." (*Id.*, End. 1, at 3) See generally, *Bituminous Cas. Corp. v. Bartlett*, 307 Minn. 72, 240 N.W.2d 310 (1976). Liberty Mutual argues that each sale by Cargill of Grits 3500 to Abbott was a separate occurrence, requiring application of the deductible amount to each.

Minnesota law on this question is largely yet to be made, cf. *Kangas v. Standard Accident Ins. Co.*, 138 Minn. 418, 165 N.W. 268 (1917), and differing strains of case law exist in other jurisdictions. See generally, Annot., 55 A.L.R.2d 1300 (1957). Given the definition of "occurrence," it is more reasonable to evaluate an occurrence as the cause of property damage rather than as the property damage itself. In other words, analysis should focus on "the underlying circumstances which resulted in the claim for damages," *Champion Int'l Corp. v. Continental Cas. Corp.*, 546 F.2d 502, 506 (2d Cir. 1976), *cert. denied*, 434 U.S. 819, 98 S.Ct. 59, 54 L.Ed.2d 75 (1977), instead of the items of property damaged. Here, the occurrence was the change in formula of Nutramine which ultimately increased the concentration of phosphorus in Grits 3500 and caused property damage to Abbott. As such, there was but one occurrence, even though numerous production "batches" of erythromycin were affected. See, *Champion Int'l Corp. v. Continental Cas. Co.*, 546 F.2d 502 (2d Cir. 1976), *cert. denied*, 434

---

5. Establishing or disputing similarities among the claims may have confused the issues or consumed time disproportionate to the exhibit's probative value. See, Fed.R.Evid. 403.

6. Before June 1, 1972, the deductible was $100,-000 per occurrence. (Pltf. Ex. 26, End. No. 7)

U.S. 819, 98 S.Ct. 59, 54 L.Ed.2d 75 (1977); *Union Carbide Corp. v. Travelers Indemnity Co.*, 399 F.Supp. 12 (W.D.Pa.1975); *Wilkinson & Sons, Inc. v. Providence Washington Ins. Co.*, 124 N.J.Super. 466, 307 A.2d 639 (L.Div.1973).

For the reasons advanced above, IT IS ORDERED:

1. That the motion of defendant for judgment notwithstanding the verdict be and hereby is denied.

2. That the motion of defendant for a new trial be and hereby is denied.