**OWENS–ILLINOIS, INC., Plaintiff,**

v.

**AETNA CASUALTY AND SURETY COMPANY, Defendant.**

**Civ. A. No. 82–0089.**

United States District Court, District of Columbia.

Nov. 21, 1984.

Paul C. Warnke, Harold D. Murry, Jr., Bryan Jay Yolles, Clifford & Warnke, Washington, D.C., for plaintiff.

John F. Mahoney, Jr., Herbert J. Miller, James E. Rocap, III, Stephen Nightingale, Washington, D.C., for defendant.

## MEMORANDUM OPINION

THOMAS F. HOGAN, District Judge.

This declaratory judgment action involves a dispute between Owens-Illinois, Inc. ("O–I") and its excess indemnity insurer, Aetna Casualty and Surety Company ("Aetna"), concerning whether Aetna is obligated to indemnify O–I for asbestos-related claims brought against it and, if so, to what extent. Two issues are before the Court on separate motions for partial summary judgment:

(1) The "Keene" Issue: Whether this Circuit's holding in *Keene Corp. v. Insurance Company of North*

*America,* 667 F.2d 1034 (D.C.Cir. 1981), *cert. denied,* 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875, *reh'g denied,* 456 U.S. 951, 102 S.Ct. 2023, 72 L.Ed.2d 476 (1982) is dispositive of the interpretation of the policies' coverage provisions; and

(2) The "Per Occurrence" Issue: What constitutes an "occurrence" for purposes of the policies' retained limit, or deductible, provisions?

## I. STATEMENT OF FACTS

O–I is an Ohio corporation with its principal place of business in Toledo, Ohio. It is engaged in the manufacture and sale of a diversified line of products fabricated from various substances including glass, paper and plastic materials. (First Amended Complaint, ¶ 1.) Between the years 1948 and 1958 O–I manufactured and sold a thermal insulation product, "Kaylo," that contained asbestos. (Affidavit of Lawrence Fitzpatrick in support of O–I's motion for partial summary judgment, *Keene* issue, [hereinafter cited as "Fitzpatrick Affidavit"] ¶ 2; Aetna's Statement of Material Facts Not in Dispute [hereinafter cited as "Aetna I"] ¶ 2.)[1] As a result, O–I has been named in thousands of lawsuits alleging injury or wrongful death caused by exposure to the asbestos in O–I's Kaylo product. (Fitzpatrick Affidavit, *supra,* ¶ 3; Aetna I, ¶ 3.) The majority of these claims allege exposure to asbestos in the late 1940s through 1958, with "manifestation" of the injuries alleged to have occurred in the mid to late 1970s and early 1980s. (Fitzpatrick Affidavit, *supra,* ¶ 4.) Thus,

the time period between the claimants' initial exposure and the alleged actual knowledge of bodily injury typically exceeds 20 years. (*Id.*)

From September 1, 1963 through September 1, 1977, O–I was continuously insured by Aetna for products liability claims under excess indemnity, or "umbrella" policies, the premiums of which have been fully paid.[2] (Affidavit of R.S. Johnson in support of O–I's motion for partial summary judgment, *Keene* issue, [hereinafter cited as "Johnson Affidavit"], ¶ 4 & Exhibits 4–14; Affidavit of Stephen L. Nightingale in support of Aetna's motion for partial summary judgment, "Per Occurrence" issue, ¶ 2 & Exhibit A.) Although the language of these policies varied slightly over the years, the coverage provided was similar in all relevant respects.[3]

Under these policies, O–I was self-insured for each occurrence resulting in personal injury up to the "retained limit" or "per occurrence deductible" set forth in the policies.[4] Between September 1, 1963 and September 1, 1971, the per occurrence deductible was $100,000. From September 1, 1971 through September 1, 1977 the deductible was $250,000. Above the deductible amount, the policies provided that Aetna would cover O–I's "ultimate net loss"[5] up to the "aggregate annual" and "per occurrence" limits set in the policies.[6]

In 1978, O–I began tendering asbestos-related damage claims to Aetna for indemnification. (Affidavit of Jama Cashdollar in support of Aetna's opposition to summary judgment, *Keene* issue [hereinafter cited

1. On or about May 1, 1958, O–I sold its "Kaylo" manufacturing operations and thereafter did not manufacture or sell any product containing asbestos. (Fitzpatrick Affidavit, ¶ 2.)

2. O–I was also insured by Aetna under an excess indemnity policy from September 1, 1960 to September 1, 1963. That policy, however, is not the subject of O–I's present motions for summary judgment. *See, infra,* footnote 7 and accompanying text.

3. There is one exception. For the policy years 1969 to 1971, Aetna's duty to indemnify O–I did not include defense costs. The Court finds,

however, that the differences between the policies do not warrant different interpretations with respect to the issues involved in this case. *Cf. Keene, supra,* at 1039 n. 6.

4. The coverage language of the 1971 policy is typical. *See* Appendix ¶ 2.1.

5. *See, e.g.,* Appendix ¶ 5.14.

6. The aggregate annual and per occurrence limits were the same within each policy, and ranged from $20 million under the 1963–1966 policy to $50 million under the 1976–1977 policy. These provisions are not at issue here.

as "Cashdollar Affidavit I"], ¶ 2, Exhibits A–CC; Johnson Affidavit, *supra*, ¶ 5). Aetna responded that it would indemnify O–I pursuant to the terms of the policies if (1) "manifestation" of the claimant's injury occurred during a policy year, and (2) O–I's net loss for *each* claim exceeded the policy's per occurrence deductible. (Aetna I *supra*, ¶ B6; Cashdollar Affidavit I, *supra*, Exhibits C and D.) O–I disputes each part of this position, and consequently initiated this action.

## II. PROCEDURAL HISTORY

O–I filed the first motion for partial summary judgment in this case, concerning whether the insurance policies in dispute provide any coverage for asbestos claims brought against O–I. O–I asserts that this Circuit's decision in *Keene Corp. v. Insurance Company of North America*, 667 F.2d 1034 (D.C.Cir.1981), *cert. denied*, 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875, *reh'g denied*, 456 U.S. 951, 102 S.Ct. 2023, 72 L.Ed.2d 476 (1982), is controlling on this issue. Under that decision O–I asserts that the "trigger" of coverage, the events or conditions that determined that the insurance policies apply to the asbestos claims, were the exposure of the claimants to asbestos fibers, or the continuing development of the disease after exposure, or manifestation of the injury. Consequently, O–I argues that since it was insured by Aetna at the time of exposure, or during some period of development of the disease, Aetna may be held liable under the policies even if the injury did not manifest itself during a policy term.[7]

Aetna strenuously opposes O–I's motion, arguing that Ohio law, rather than the *Keene* decision, is controlling. Aetna asserts that a material issue of fact exists under Ohio law as to whether O–I's subjective construction of the policies was that manifestation of the injury was necessary to trigger coverage. Aetna argues, therefore, that summary judgment on this issue is precluded.

After O–I filed its motion on the *Keene* issue, Aetna moved for partial summary judgment on a separate issue. Aetna argues that even if coverage under the policies was triggered by an event prior to manifestation on the injury, the retained limit provisions of the policies are clear and unambiguous, and require O–I to pay a deductible "per occurrence." Aetna asserts that, under the terms of the policies, each asbestos claimant's injury was a separate occurrence. Therefore, Aetna argues that O–I must pay a deductible on *each* asbestos claimant's lawsuit before Aetna is obligated to indemnify O–I. As a practical matter, Aetna's position on this "per occurrence" issue would effectively deny O–I coverage since the deductibles set in the policies are larger than the amount of any claim yet successfully brought against O–I.

O–I subsequently filed a cross-motion for partial summary judgment on the "per occurrence" issue. O–I asserts that, rather than each claimant's exposure to asbestos constituting an occurrence, the overall injury caused by the exposure of these claimants to O–I was the result of a single occurrence, the manufacture and sale of an asbestos-containing product. O–I argues that to the extent the policies are ambiguous as to what constitutes an occurrence, the provision must be construed in favor of O–I as the insured. Therefore, O–I contends that it should be liable only for a single deductible on the total of the claims brought against it for asbestos injury.

Aetna's opposition to O–I's cross-motion for partial summary judgment on the per occurrence issue argues that resolution of the "per occurrence" dispute requires further discovery to develop a factual framework of the conditions that asbestos claimants were exposed to, and O–I's "business purpose" in purchasing insurance. In effect, therefore, Aetna has retreated from its initial position asserting the absence of disputed material facts and seeking partial summary judgment on the per occurrence issue, and Aetna now opposes summary

---

**7.** Since the parties' insurance agreement effective September 1, 1960 expressly provided that

"manifestation" of the injury triggered coverage, it is not included in O–I's motions.

judgment on both the *Keene* and "per occurrence" issues. Nevertheless, the Court finds this matter ripe for summary judgment.

## III. DISCUSSION

 Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. The issues before this Court concern the proper construction of excess indemnity policies. As a general rule, the construction and effect of a written contract of insurance is a matter of law to be determined by the Court. *See* 2 G. COUCH, INSURANCE 2d § 15.3, at 116 (1984). Where the Court decides that, as a matter of law, extrinsic evidence is inadmissible, a case is appropriately resolved by summary procedure. *See Douglas Equipment Co. v. Hartford Accident & Indemnity Co.*, 435 F.2d 1024, 1028 (7th Cir.1970); *McKeithen v. S.S. Frosta*, 430 F.Supp. 899, 901 n. 2 (E.D.La.1977).

Although the Court is mindful that extrinsic evidence is often admissible to aid the Court in construing policy language, this Circuit's decision in *Keene v. Insurance Company of North America*, 667 F.2d 1034 (D.C.Cir.1981), *cert. denied*, 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875, *reh'g denied*, 456 U.S. 951, 102 S.Ct. 2023, 72 L.Ed.2d 476 (1982), makes it clear that the construction of an insurance policy with respect to coverage of asbestos-related diseases is based on the terms of the policy, the principles embodied therein, and the expectations that the insured could have reasonably formed as an objective matter on the basis of the policy's language.

*Keene*, 667 F.2d at 1038 n. 3, 1041–42 and n. 12. *Accord AC & S v. Aetna Casualty & Surety Co.*, 576 F.Supp. 936, 940–41 (E.D.Pa.1983); *Commercial Union v. Pittsburgh Corning Corp.* 553 F.Supp. 425, 433 (E.D.Pa.1981). Accordingly, the issues before this Court are purely legal.

For the reasons that follow, the Court finds, first, that *Keene* is dispositive of the interpretation of the subject policies' coverage provisions. Hence, Aetna's duty to indemnify O–I for asbestos claims is triggered if a policy was in effect at any time between a claimant's initial exposure to asbestos and the manifestation of asbestos-related injury. Further, the Court finds O–I's manufacture and sale of Kaylo a single "occurrence" for purposes of the policies' retained limit, or deductible, provisions.

### A. The Keene Issue

Asbestos manufacturers and their insurers are familiar litigants to the courts of this Circuit.[8] In *Keene* the Court of Appeals for this Circuit was called upon to adjudicate the rights and obligations of Keene Corporation, an asbestos manufacturer, and its primary insurance carriers under Comprehensive General Liability Policies (CGL's) with respect to Keene's liability for asbestos related injuries. The *Keene* Court held that the policies' "trigger"—the occurrence of injury—was a continuing process beginning with the inhalation of asbestos fibers, proceeding through the damage caused by fibers in residence in the lungs, and ending with the manifestation of an asbestos related disease. 667 F.2d at 1047.[9] Accordingly, the Court held in

---

**8.** For a discussion of previous disputes between asbestos manufacturers and their insurers, as well as among a manufacturer's various insurers, *see, e.g.*, Note, *Adjudicating Asbestos Insurance Liability: Alternatives to Contract Analyses*, 97 HARV.L.REV. 739 (1984); Note, *Asbestos Litigation: The Insurance Coverage Question*, 15 IND.L.REV. 831 (1982).

**9.** Like O–I policies with Aetna, the policies at issue in *Keene* clearly provided that the "injury," and not the "occurrence" that causes it, must fall within a policy period for coverage to be

triggered. *Keene*, 667 F.2d at 1040. In the usual case of injury, both the occurrence and injury transpire simultaneously, or, at least in close temporary proximity to one another. *Id.* In cases involving asbestos-related disease, however, the "occurrence" that causes the injury takes place substantially before the manifestation of the ultimate injury. Further, medical evidence demonstrates that latent injury occurs before the diseases manifest themselves. Accordingly, determining the trigger, or time of injury, presents difficult problems of contractu-

*Keene* that any policy in effect during any point in this process covered Keene's potential liability. *Id.* The Court further held that, once triggered, a policy covered Keene's *entire* liability up to its stated limits, subject to the policies' "other insurance" clauses. *Id.* In order to prevent the insured's "stacking" of limits, however, the Court held that only one policy could be applied to each injury, and that Keene was to select the policy under which it was to be indemnified. *Id.* at 1049–50.

O–I argues that principles of *stare decisis* and collateral estoppel require this Court to follow the decision in *Keene.*[10] Aetna counters that Ohio law, not *Keene*, controls the disposition of this case, and argues that under Ohio law, as enunciated in *Eagle Picher Industries, Inc. v. Liberty Mutual Insurance Co.,* 682 F.2d 12 (1st Cir.1982), *cert. denied,* 460 U.S. 1028, 103 S.Ct. 1279, 75 L.Ed.2d 500 (1983), extrinsic evidence of the parties' subjective construction of the policies is admissible to assist the Court. In particular, Aetna argues that correspondence between the parties may demonstrate that O–I itself took the position that the manifestation of injury determines the trigger of coverage, rendering summary judgment on this issue inappropriate. For the reasons that follow, the Court finds *Keene* controlling.

■ The doctrine of *stare decisis* compels district courts to adhere to a decision of the Court of Appeals of their Circuit until such time as the Court of Appeals or the Supreme Court of the United States sees fit to overrule the decision. *See, e.g., Brewster v. Commissioner of Internal Revenue,* 607 F.2d 1369, 1373 (D.C.Cir. 1979); *Breakefield v. District of Columbia,* 442 F.2d 1227, 1229–30 (D.C.Cir.1970); 1B. J. Moore, J. Lucas, T. Currier,

MOORE'S FEDERAL PRACTICE ¶ 0.402 [1], [2] (2 ed. 1983). District courts are not at liberty to resolve splits between Circuits no matter how egregiously in error they feel their Circuit to be. *See Hasbrouck v. Texaco,* 663 F.2d 930, 933 (9th Cir.1981). Further, *stare decisis* requires that a court follow its own, or its Circuit's, earlier determination as to the law of a state in the absence of any subsequent change in the state law. *Newell v. Harold Shaffer Leasing Co.,* 489 F.2d 103, 107 (5th Cir.1974). *Accord Sprinkle v. Farm Bureau Ins. Companies,* 492 F.2d 469, 471–72 (5th Cir. 1974).

The *Keene* decision was issued against a backdrop of generally accepted principles of insurance interpretation that find their source in state law. In *Keene* the Court found it unnecessary to identify the applicable state law, finding that none of the potentially applicable state laws provided specific guidance in resolving the case, and that basic principles governing the interpretation of insurance policies were the same in each state. *See Keene* at 667 F.2d 1041 & n. 10. These principles of insurance policy interpretation are: (1) the objective in construing the policies' coverage of liability must be to give effect to the policies' dominant purpose of indemnity; (2) ambiguity in an insurance contract must be construed in favor of the insured; and (3) the Court should ordinarily strive to give effect to the objectively reasonable expectations of the insured. *Id.* at 1041.

■ A searching review of Ohio law reveals that the Ohio courts have yet to decide the specific issues before this Court.[11] However, because the basic principles underlying the *Keene* decision find general acceptance in Ohio precedent, this Court

---

al interpretation in the area of asbestos-related diseases. *Id.*

**10.** O–I's collateral estoppel assertion rests on the fact that Aetna was one of the defendant insurers in *Keene.* Because the Court finds *Keene* dispositive under principles of *stare decisis,* it does not address O–I's collateral estoppel arguments.

**11.** Jurisdiction in this case exists under 28 U.S.C. § 1332 by virtue of diversity of citizenship between O–I and Aetna. The parties and the Court agree that Ohio law is the applicable state law as it is the state with the more substantial interest in the resolution of these issues. *See Fowler v. A & A Co.,* 262 A.2d 344, 348 (D.C.App.1970); *Stevens v. American Service Mutual Ins. Co.,* 234 A.2d 305, 309 (D.C.App. 1967).

finds that it is bound by the decision in *Keene* as to what these general principles mandate. Accordingly, this Court must hold that coverage was triggered if the claimant was exposed to asbestos during the term of the policy, or if the disease was developing during the term, or when manifestation occurred.[12]

The Court rejects Aetna's attempt to establish inconsistencies between Ohio law and the basic precepts of insurance law that guided the court in *Keene*. As Judge Flannery's Order of May 30, 1982 makes clear, Ohio insurance law does not deviate from general insurance jurisprudence in any important respect or contain any nuances unique to that jurisdiction. *Owens-Illinois v. Aetna Casualty and Surety Co.*, No. 82–89, slip op. at 2, (D.D.C. March 30, 1982). For example, the first principle embodied in *Keene* of construing coverage provisions to give effect to the policies' dominant purpose of indemnity is consistent with Ohio precedent. *See, e.g., Bobier v. National Casualty Co.*, 143 Ohio St. 215, 219, 54 N.E.2d 798, 800 (1944) (contract of indemnity should be construed in light of the purpose to be accomplished); *Moss v. Travelers Ins. Co.*, 9 Ohio Misc. 71, 221 N.E.2d 607, 611 (1965) (policy must be construed most favorably to the insured in order to effectuate its obvious purpose); *Clements v. Aetna Casualty & Surety Co.*, 15 Ohio Misc. 252, 236 N.E.2d 799, 801–02 (1968) ("in accord with the presumed intention of the parties, the construction should not be such as to defeat, ... the insured's claim to the indemnity

which it was his object to secure and for which he paid a premium") (*citing* 30 Ohio Jur.2d Insurance ¶ 217).

The second *Keene* principle, to construe ambiguities in favor of the insured, is also universally accepted in Ohio. *See, e.g., Travelers Indemnity Co. v. Reddick,* 37 Ohio St.2d 119, 121, 308 N.E.2d 454, 455–56 (1974) (well settled that ambiguous insurance contract language to be strictly construed against insurer); *Morfoot v. Stake,* 174 Ohio St. 506, 507, 190 N.E.2d 573, 574 (1963) (policy open to different interpretations to be construed in favor of insured); *Home Indemnity Co. v. Village of Plymouth,* 146 Ohio St. 96, 101, 64 N.E.2d 248, 250 (1945) (same); *Toms v. Hartford Fire Ins. Co.,* 146 Ohio St. 39, 42, 63 N.E.2d 909, 910–11 (1945) (well recognized in Ohio that insurance contract prepared by insurer to be liberally construed in favor of insured).

Finally, Ohio courts also utilize the reasonable expectations doctrine embodied in *Keene*. *See e.g., Sommer v. General Insurance Co.,* 22 Ohio App.2d 149, 159, 259 N.E.2d 142, 146 (1970) (to deny insured right to adduce proof would defeat "the reasonable expectations of coverage of the purchaser"); *Carpenter v. Gasper,* 116 Ohio App. 45, 48, 186 N.E.2d 481, 484 (1962) (must consider what a reasonable person in the position of the insured would have expected); *Brescoll v. Nationwide Mutual Insurance Co.,* 116 Ohio App. 537, 541, 189 N.E.2d 173, 175 (1961); *Carter v. Bernard,* 27 Ohio Misc. 165, 168, 269 N.E.2d 139, 141 (Ohio Com.Pl.1971) (any doubtful language should be construed

---

**12.** It should be noted that other circuits dealing with precisely the same issue as the *Keene* court have reached different results, with the First Circuit's adopting the "manifestation theory" advocated by Aetna in this case. *See Eagle-Picher Industries v. Liberty Mutual Insurance Company,* 682 F.2d 12, 23 (1st Cir.1982), *cert. denied,* 460 U.S. 1028, 103 S.Ct. 1279, 75 L.Ed.2d 500 (1983) (policy triggered by claim that asbestos related disease has manifested itself during the policy period). The Eighth Circuit, contrary to both *Eagle-Picher* and *Keene,* has held that exposure alone triggers coverage. *See Insurance Company of North America v. Forty-Eight Insulations, Inc.,* 633 F.2d 1212, 1225 (6th Cir.1980), *cert. denied,* 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d

650 (1981), *reh'g denied,* 455 U.S. 1009, 102 S.Ct. 1648, 71 L.Ed.2d 878 (1982). *See also Porter v. American Optical Corp.,* 641 F.2d 1128, 1145 (5th Cir.1981) (rejecting manifestation theory and adopting *Forty-Eight's* injurious exposure holding). As the Sixth Circuit noted in *Forty-Eight,* each of these different theories has its "flaws and anomalies" resulting in no truly satisfactory solution to the issue. *Id.* at 1226. Nevertheless, *Keene* is the law of this Circuit, and this Court is therefore bound by that decision; however, the serious social problem presented by these many claims cry out for legislative resolution, not court imposed socioeconomic solutions.

most strongly against the surety and in favor of the indemnity which the insured had reasonable ground to expect); *Wagner v. Nationwide Mutual Insurance Co.*, 14 Ohio Misc. 220, 222, 235 N.E.2d 741, 743 (Ohio Com.Pl.1968) (presumption that the insurer intended the insured to understand that he would be protected to the full extent that any fair interpretation would allow).

The Court rejects Aetna's contention that *Keene*'s principles conflict with the Ohio principle of construing an insurance policy to effectuate the parties' intent. The *Keene* rationale, in emphasizing the language of the policies and the expectations that the insured could have reasonably formed on the basis of the language, plainly seeks to ascertain and effectuate the intent of the parties in light of the policies' purpose of indemnity. *See Keene*, 667 F.2d at 1041–42. *Cf. Eli Lilly & Co. v. Home Insurance Co.*, No. 82–0669, Mem.Op. at 18 (D.D.C. September 30, 1982). As one commentator notes:

> [T]he Courts have pursued two basic methods of analysis in the interpretation of insurance contracts. One involves investigating the meaning of the words themselves, while the other concerns ascertaining the intention of the parties. Although courts have often described the latter as the "polar star" or controlling element in the construction of an insurance policy, it is not always analytically feasible to or entirely rational to separate the inquiry into discrete channels of investigation and conclude that one clearly dominates the other. As a practical matter language and intent are counterpoised in a reciprocal posture ....
>
> \* \* \* \* \* \*
>
> [L]anguage used in a contract or any writing represents the drafter's conscious preference of some terms to the exclusion of others. This act of rhetorical selection is, in and of itself, a manifestation of intent.

Comment, *Liability Insurance for Insidious Disease: Who Picks Up the Tab?* 48 FORDHAM L.REV. 673, 676 (1980).

■ Because the general principles embodied in *Keene* comport with Ohio law regarding the interpretation of insurance contracts, including effectuating the intent of the parties, this Court rejects Aetna's argument that summary judgment must be denied to allow consideration of extrinsic evidence of the parties' subjective construction of the policies. The *Keene* Court expressly based its decision on "the expectations that Keene could have reasonably formed *as an objective matter*, on the basis of the policies' language." *Keene*, 667 F.2d at 1042 n. 12 (emphasis added).[13] Implicit in this statement is a finding that extrinsic evidence of the parties subjective intent or construction is irrelevant to the policies' interpretation. *See Emons Industries, Inc. v. Liberty Mutual Fire Ins.*, 567 F.Supp. 335, 339 (S.D.N.Y.1983).

A review of the briefs submitted by the parties in *Keene* further substantiates this finding. As in the present case, the insurance companies in *Keene* argued that Keene's own admissions and conduct belied its position before the Court. *See, e.g.,* Appellee Liberty Mutual Insurance Company's Opening Brief, at 67 (arguing that Keene acquiesced in Liberty's manifestation approach); Appellee Hartford Accident and Indemnity Company's Opening Brief, at 21–22 (arguing that a number of documents prepared by Keene demonstrated Keene's specific recognition that Keene itself would bear responsibility for uninsured period); Appellee Liberty Mutual Insurance Company's Opening Brief, at 28 (arguing that the fact that Keene threw its policies away demonstrated that no one, insurers or insured, ever imagined policies from past decades have any bearing on diseases manifest today). The *Keene* litigants also extensively briefed the effects to be given the insurers' conduct and whether or not they had subjectively adopted an obligation to pay "all sums" as opposed to only pro-

**13.** This key footnote was added, *sua sponte,* some two weeks after the opinion was released, subsequent to the filing of a petition for reconsideration.

rating a share to Keene. *See* Appellant Keene Corporation's Opening Brief, at 14–15, 24–27; Hartford's Opening Brief at 23; Insurance Company of North America's Opening Brief at 8; Amicus Curiae Armstrong World Industries, et al. Opening Brief at 15–19, Reply Brief at 8–10; Amici Curiae Federal Insurance Company and Fireman's Fund Insurance Company's Opening Brief at 28–31; Appellant Keene Corporation's Reply Brief at 9–10; Liberty Mutual's Opening Brief at 11–13. The *Keene* Court disregarded these arguments, thus implicitly finding the parties' subjective constructions irrelevant. Accordingly, the constructions placed on the policies by O–I during its course of dealings with Aetna are irrelevant to the disposition of this case.[14]

Aetna next attempts to bar application of *Keene* by arguing that there is a material issue of fact as to whether the purpose and principles underlying the *Keene* decision are present here. In particular, Aetna asserts that the reasonable expectations principle applied by the *Keene* court applies only where there is a contract of adhesion, and, Aetna argues, there is a material issue as to whether the contract of adhesion characterization is justified as applied to O–I. This attempt to avoid application of *Keene*, however, is also unavailing.

■ Professor Keeton, now Judge Keeton, formulated the reasonable expectations doctrine as follows: "The objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations." Keeton, *Insurance Law Rights at Variance With Policy Provisions*, 83 HARV.L.REV. 961, 967 (1970). Although the expectations principle arose as a response to the adhesive insurance contract[15]

and is generally used in consumer cases, the principle is now being employed in varying situations with varying justifications, including situations where, as here, the insured is alleged to be sophisticated. *See, e.g., Crown Cork & Seal Co., Inc. v. Aetna Casualty & Surety Co.*, No. 1292, slip op. at 7 (Pa.Com.Pl. August 1983) (even though parties of comparable bargaining power, if policy language unclear and court finds insured could reasonably expect coverage not explicitly within the contract terms, the ambiguity is construed in favor of coverage). *See also* Note, *Insurers Liability in the Asbestos Disease Context—Application of the Reasonable Expectations Doctrine*, 27 S.D.L.REV. 239, 253–54 (1982) [hereinafter cited as Insurer's Liability]; Abraham, *Judge Made Law and Judge Made Insurance: Honoring the Reasonable Expectations of the Insured*, 67 VA.L.REV. 1151, 1153 (1981).

Not only have courts deciding coverage disputes between asbestos manufacturers and their insurers relied on the reasonable expectations principle, but some authors suggest that the apparently divergent interpretations of the Comprehensive General Liability (CGL) policy in the context of asbestos related disease are reconcilable in that each represents an attempt to honor the parties' reasonable expectations. *See* Note, Insurer's Liability, *supra*, 27 S.D.L. REV. at 241; Ingram, *Insurance Coverage Problems in Latent Disease and Injury Cases*, 12 ENVTL.L 317, 344 (1982); Note, *The Insurance Problem in Asbestos Litigation: A Case for the Manifestation Theory*, 57 ST. JOHN'S L.REV. 485, 506 (1983).

Finally, the Court notes that the *Keene* Court was presented with the argument that the reasonable expectations principle should not apply where the insured is sophisticated, *see* Amici Curiae Federal Insurance Company and Firemen's Fund Insurance Company's Opening Brief at 25–26,

**14.** For the same reasons, the Court also rejects Aetna's contention that O–I is estopped from "disavowing its earlier contract interpretation."

**15.** Adhesion contracts have been defined as standard form contracts, offered on a take it leave it basis by one party to a second party

with much less bargaining power. Note, *A Common Law Alternative to the Doctrine of Reasonable Expectations in the Construction of Insurance Contracts*, 57 N.Y.U.L.REV. 1175, 1178 (1982).

and therefore implicitly rejected it. *See also, Crown Cork & Seal Co., Inc. v. Aetna Casualty & Surety Co., supra,* at 8 n. 6 (rejecting Aetna's argument that *contra preferentum* does not apply where there is relative parity in bargaining power); *Commercial Union Insurance v. Pittsburgh Corning Corp.,* 553 F.Supp. 425, 429 (E.D. Pa.1981) (balance of economic resources does not create an exception to the rule of strict construction). *But see Schering Corp. v. Home Insurance Co.,* 712 F.2d 4, 10 n. 2 (2d Cir.1983) (accepting Aetna's argument). Aetna's assertion of disputed issues of material fact must therefore fail.

As noted previously, principles of *stare decisis* compel adherence to a factually indistinguishable case decided by the Court of Appeals of this Circuit. *E.g., Brewster v. Commissioner of Internal Revenue,* 607 F.2d 1369, 1373 (D.C.Cir.1979). The policies before the Court in *Keene* required the insurer to "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury ... caused by an occurrence." *Keene* at 1039. Bodily injury was defined as "bodily injury, sickness or disease sustained by any person." *Id.* Occurrence was defined as "an accident including injurious exposure to conditions, which results, during the policy period, in bodily injury ... neither expected nor intended from the standpoint of the insured." *Id.* The policies at issue here provide that Aetna will indemnify O–I for its "ultimate net loss in excess of the applicable underlying limit which the insured becomes legally obligated to pay as damages because of personal injury ... caused by an occurrence," and define personal injury as "bodily injury, shock, mental anguish, sickness or disease," and occurrence as "an accident, including injurious exposure to conditions, which results, while this policy is in force, in personal injury ... neither expected nor intended from the standpoint of the insured." [16] Thus, the indemnification provi-

sions here are identical to those before the *Keene* Court. The sole difference between the policies is that *Keene* dealt with primary insurers while the policies here are excess policies. This difference, however, is insignificant. Accordingly, the *Keene* holding is dispositive of the instant coverage dispute. *See, e.g.,* 1B J. Moore, J. Lucas, T. Currier, MOORE'S FEDERAL PRACTICE ¶ 0.402[1] at 42–44 (2 ed. 1983) (inferior courts are not free to limit appellate court rules to the precise facts of the case).

Aetna's duty to indemnify O–I for asbestos-related claims was therefore triggered if a policy was in effect at any point in time between a claimant's initial exposure to asbestos and manifestation of the injury. Once triggered, a policy provides coverage for O–I's full liability according to its terms without any proration of that liability to O–I. If more than one policy applies to a given claim, O–I may designate the policy whose limits will apply in that case but may not "stack" policy limits.

### B. *The Per Occurrence Issue*

As noted above, the policies at issue here are excess indemnity or "umbrella" policies. Under these umbrella policies, O–I retains responsibility for any liability from its products until the loss from one occurrence exceeds the per occurrence deductible.[17] Above this amount, Aetna is required to indemnify O–I for its losses subject to the "per occurrence" and "aggregate annual" limits set forth in the policies.

Under this Court's ruling as set forth above, O–I may assign its liability for asbestos-related disease to a policy if any part of the injurious process associated with asbestos occurred while that policy was in effect. The remaining issue is whether O–I's liability arose from a single occurrence, that being O–I's manufacture and sale of the product containing asbes-

---

**16.** *See supra,* Appendix (setting forth provisions of 1971 policy).

**17.** Generally, an insured will carry primary insurance to cover initial liability. Here, however, O–I was "self-insured" for this amount.

tos, or multiple occurrences, being each individual claimant's exposure to asbestos. Regarding the manufacture and sale of Kaylo as the single occurrence triggering liability would require O–I to absorb a single deductible from the aggregate of claims against it, leaving Aetna to satisfy the excess liability. If each claimant's exposure to the product must be regarded as a separate occurrence, on the other hand, O–I must absorb a deductible on each asbestos claimant's lawsuit before Aetna is obligated to indemnify it. This "multiple occurrence" interpretation would effectively deny O–I coverage because the deductibles are larger than the amount of any single claim successfully brought against O–I to date.

The term "occurrence" is generally defined in the policies as "an accident, including continuous or repeated exposure to conditions, which results in personal injury ... which is neither expected nor intended from the standpoint of the insured." [18] The policies' "Limits of Liability" provisions [hereinafter "unifying definitional provisions"] are also relevant here. They provide in pertinent part:

> Regardless of the number of ... (2) persons or organizations who sustain injury or damages, or (3) claims made or suits brought on account of personal injury ... [Aetna's liability] resulting from any one occurrence shall be limited to the amount stated in Section 1 as applicable to "each occurrence" ... [and] "aggregate annual" ....

> \* \* \* \* \* \*

> For the purpose of determining the limit of [Aetna's] liability, all personal injury ... arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence.[19]

Given the policies' definition of "occurrence" and the policies' unifying definitional provisions, the calculation of the number of occurrences must focus on the underlying *circumstances* which resulted in the personal injury and claims for damage rather than each individual claimant's *injury*. *See Michigan Chemical Corp. v. American Home Assurance Co.*, 728 F.2d 374, 379–80 (6th Cir.1984), (noting vast majority of courts have concluded that number of occurrences for purposes of coverage limitations determined by reference to cause(s) of the damage, and not number of injuries or claims). *Accord Appalachian Insurance Co. v. Liberty Mutual Insurance Co.*, 676 F.2d 56, 61 (3rd Cir.1982); *Champion International Corp. v. Continental Casualty Co.*, 546 F.2d 502, 505–06 (2d Cir.1976); *Transport Insurance Co. v. Lee Way Motor Freight, Inc.*, 487 F.Supp. 1325, 1330 (N.D.Tex.1980); *Cargill, Inc. v. Liberty Mutual Ins. Co.*, 488 F.Supp. 49, 53 (D.Minn.1979).

The unifying definitional provisions make it clear that the number of injuries or claims, even if temporally removed from their causes, are irrelevant when determining the number of occurrences. *Accord, Michigan Chemical, supra,* 728 F.2d at 379–80; *Appalachian, supra,* 676 F.2d at 61. "Using this analysis, the Court asks if there was but one proximate, uninterrupted and continuing cause which resulted in all of the injuries and damages." *Id.* at 61. *See also, Michigan Chemical, supra,* at 379 n. 5; *Champion, supra,* 546 F.2d at 505–06; *Lee Way Motor, supra,* 487 F.Supp. at 1330; *Cargill, supra,* 488 F.Supp. at 53.

Although the parties agree that the determination of the number of occurrences focuses on the cause, rather than the effect, of the injury, this is the extent of their agreement. Aetna instituted the initial motion for summary judgment on this issue, arguing that O–I is required to pay a deductible for each claimant's lawsuit before Aetna is obligated to provide O–I any coverage. O–I cross-moved for summary judgment arguing that all asbestos-related personal injury alleged by claimants in the underlying suits against O–I was caused by

---

18. *See* Appendix ¶ 5.10 (setting forth typical definition of "occurrence).

19. *See* Appendix ¶ 4.1 (setting forth typical "Limits of Liability" provision).

a single occurrence, the continuous or repeated exposure to the asbestos in the Kaylo product commercially manufactured and sold by O–I. Aetna thereupon retreated from its earlier position and it now argues that O–I's cross-motion on this issue rests on certain factual assumptions that are either in dispute or without support in the record before the Court. First, Aetna argues that O–I "injected" a new factual issue into this case concerning O–I's "business purpose" in purchasing insurance. Second, Aetna posits that this Court is required to examine elements such as a claimant's time, place and length of exposure, type of product and similar factors in order to properly determine whether claims may be aggregated into a single occurrence pursuant to the unifying definitional provision. Despite Aetna's assertions of disputed factual matters, the Court finds this issue ripe for summary judgment.

■■■ Aetna implies that the rights and obligations created by the "occurrence" provisions cannot be determined without consideration of the facts of a particular claimant's exposure to asbestos. The Court has before it, however, the terms of the insurance policies, the fact that asbestos related disease developed after exposure to O–I's product and the fact that O–I can be held liable for the injuries. *Cf. Keene*, 667 F.2d at 1038 n. 3, 1040. The Court is not aware of any facts that would come to light in an underlying claim that would be relevant to the interpretation of the retained limit/per occurrence provisions in the context presented here. Aetna concedes that its requested factual framework does not go to the meaning of the subject provisions but to the facts in the underlying cases. Since Aetna admits that it is not known how little exposure to asbestos is required to cause disease, the Court has difficulty in discerning the relevance of these underlying facts.

More importantly, Aetna's request that this Court stay resolution of this case until it is able to ascertain thousands or possibly tens of thousands of individual claimants' conditions of exposure to asbestos would entail an administrative nightmare. Such a task would necessarily span several calendar years. To posit that such an undertaking is contemplated by the language of the unifying definitional provisions is a clear distortion of the policy language. Accordingly, the Court finds Aetna's underlying "framework" irrelevant to the disposition of the present issue. Since irrelevant evidence is by definition immaterial, a proffer of it does not and cannot create an issue of material fact. Fed.R.Civ.P. 56; *McKeithen v. S.S. Frosta*, 430 F.Supp. 899, 905 (E.D. La.1977).

■■■ Aetna's request for discovery of O–I's "business purpose" in purchasing indemnity insurance is likewise an irrelevant issue of fact for purposes of summary judgment. The *Keene* decision has already enumerated an insured's "business purpose" in purchasing insurance: "an exchange of an uncertain loss [the possibility of incurring legal liability] for a certain loss [the premium payment] .... At the heart of the transaction is the insured's purchase of certainty—a valuable commodity." 667 F.2d at 1041.

This Circuit's decision in *Keene* makes it clear that the principles embodied in the policies provide a sufficient basis for resolving this case. *See Keene*, 667 F.2d at 1041. In discerning these principles, the Court is to be guided by the expectations that O–I could have reasonably formed, as an objective matter, on the basis of the policies' language. *Id.* at 1041–42 and n. 12. *Cf. Champion International Corp. v. Continental Casualty Co.*, 546 F.2d 502, 505 (2d Cir.1976) (deductible provisions should be examined in light of the business purpose sought to be achieved and plain meaning of the words chosen by the parties to effect those purposes); *Transport Insurance Co. v. Lee Way Motor Freight, Inc.*, 487 F.Supp. 1325, 1327 (N.D.Tex.1980) (same). *See also Union Carbide Corp. v. Travelers Indemnity Co.*, 399 F.Supp. 12, 17 (W.D.Pa.1975) (terms of policy should be construed in light of the hazard insured against).

In determining O–I's reasonable, objective interpretation of the policies, the starting point must be an examination of O–I's expectations regarding Aetna's promise of certainty to O–I. Such a reasonable interpretation is that the policies issued to O–I were intended to relieve O–I of the risk of liability of which O–I could not be aware when it purchased insurance. *Cf. Keene,* 667 F.2d at 1047. O–I did not expect, nor should it have expected, that its security would be undermined by the arrival of a proliferation of products litigation virtually unprecedented in the history of the American judicial system.[20] If O–I were obligated to pay a deductible on each claimant's lawsuit, O–I would be deprived of the security for which it paid. Such an interpretation would effectively emasculate the coverage purchased by O–I since no individual claim exceeds the amount of the deductible. On the other hand, the single occurrence interpretation maintains O–I's reasonable expectations.

As discussed previously, the policies' definition of occurrence and unifying definitional provisions focus on the cause of injury. Therefore, the Court's inquiry is whether there was one proximate, uninterrupted and continuing cause which resulted in all of the injuries and damage. *E.g., Appalachian, supra,* 676 F.2d at 61. Analysis should focus on "the underlying circumstances which resulted in the claim for damages." *Champion, supra,* 546 F.2d at 505–06. Here, the underlying circumstance that gave rise to the claims for damages was O–I's manufacture and sale of a hazardous asbestos containing product. O–I was insuring against its liability for personal injuries arising out of its products. O–I's liability in the underlying suits is premised on the claimants' submission of proof that among the asbestos fibers that he inhaled was an asbestos fiber from O–I's "Kaylo." *See, e.g. Borel v. Fibreboard Paper Products,* 493 F.2d 1076, 1096 (5th Cir.1973), *cert. denied,* 419 U.S. 869, 95

S.Ct. 127, 42 L.Ed.2d 107 (1974) (holding asbestos manufacturers jointly and severally liable for asbestos related diseases that were caused, in part, by its products). It is undisputed that all suits brought by all claimants share a common feature: each claimant alleges at least one exposure to O–I's asbestos-containing product. *See* Affidavit of John S. Backer in Support of Aetna's Opposition to Partial Summary Judgment, "per occurrence" issue.

An examination of the policies' large annual and per occurrence limit provisions also supports the conclusion that, when O–I purchased the policies, the parties reasonably expected that O–I would be required to pay only one deductible for claims like those resulting from asbestos-related injury. The insurance package purchased by O–I in 1972, for example, provides for a total limit of $20 million for each occurrence, an aggregate annual limit of $20 million and a per occurrence deductible for products of $250,000. If, as Aetna initially argued, each separate claim constituted one occurrence, then Aetna's limit of liability provisions would be rendered meaningless as it strains the imagination to conceive of a single claim that would generate $20 million of damage. On the other hand, it is reasonably foreseeable that a manufacturer, who is principally engaged in the manufacture and sale of glass containers, would be involved in a causative event producing multiple injuries and resulting in *total* damages of $20 million or more.

Finally, the single occurrence characterization of all personal injury arising out of exposure to O–I's asbestos-containing Kaylo product is confirmed by courts that have addressed similar disputes concerning per occurrence deductibles. *See, e.g., Champion International Corp. v. Continental Casualty Corp.,* 546 F.2d at 505–06 (2d Cir.1976) (insured's sale and subsequent distribution of defective panels to 1400 claimants single occurrence under unifying

**20.** *See* Special Project, *An Analysis of the Legal, Social and Political Issues Raised by Asbestos Litigation,* 36 VANDER.L.REV. 573, 577–80 (1983) (noting that approximately 30,000 individual plaintiffs have filed suits against asbestos manufacturers since 1973, and experts predict that plaintiffs will file an additional 500 suits each month).

definitional provision); *Transport Insurance Co. v. Lee Way Motor*, 487 F.Supp. 1325, 1330–31 (N.D.Tex.1980) (pattern and practice of discrimination single occurrence); *Cargill, Inc. v. Liberty Mutual Insurance*, 488 F.Supp. 49 at 53 (D.Minn. 1979) (production of defective medium for growing antibiotics single occurrence despite separate sales of defective product and numerous "batches" affected); *Wilkinson & Son, Inc. v. Providence Washington Insurance Co.*, 124 N.J.Super. 466, 471, 307 A.2d 639, 642 (1973) (contractor damaging several apartments by tracking paint on carpets single occurrence); *Southern International Corp. v. Poly-Urethane Industries, Inc.*, 353 So.2d 646, 648 (Fla. Dist.Ct.App.1977) (contractors damaging several different condominiums while applying sealant to each roof single occurrence).

In sum, the allocation of rights and obligations established by the insurance policies would be undermined if O–I's coverage is subject to multiple deductibles. The Court finds that in order to preserve O–I's reasonable expectations, the manufacture and sale of Kaylo must be regarded as the single occurrence triggering liability for asbestos-related injury. The Court concludes, therefore, that O–I's coverage under a policy for asbestos-related claims is subject to payment of a single deductible. "Occurrence" is interpreted to mean all personal injury arising out of the asbestos contained in O–I's Kaylo products.

CONCLUSION

In view of the foregoing, there being no genuine issue as to any material facts and O–I being entitled to judgment as a matter of law on both the *Keene* and per occurrence issues, the Court finds that summary judgment must be granted on both of O–I's motions.

APPENDIX

POLICY NO. 02XS 7525SCA
(9/1/71–9/1/72)

[Section 1—Declaration sets forth policy's Limits of Liability as (1) "Each Occurrence"—$20,000,000; (2) "Aggregate Annual"—$20,000,000; (3) "Retained Limit"—$50,000]

\* \* \* \* \* \*

2.1 COVERAGE. The company will indemnify the insured for ultimate net loss in excess of the applicable underlying limit which the insured shall become legally obligated to pay as damages because of

A. Personal Injury,

B. Property Damage, or

C. Advertising Offense

to which this policy applies, caused by an occurrence anywhere in the world,

. . .

\* \* \* \* \* \*

4.1 Regardless of the number of (1) insureds under this policy, (2) persons or organizations who sustain injury or damages, or (3) claims made or suits brought on account of personal injury, property damage or advertising offense, the company's liability for ultimate net loss resulting from any one occurrence shall be limited to the amount stated in Section 1 as applicable to "each occurrence"; provided, however, that the company's liability shall be further limited to the amount stated in Section 1 as "aggregate annual" with respect to all ultimate net loss because of personal injury or property damage which occurs during each annual period while this policy is in force commencing from its effective date, and arises out of (1) the products hazard or the completed operations hazard or (2) occupational diseases of employees of the insured, such limit applying separately to (1) and (2).

For the purpose of determining the limit of the company's liability, all personal injury, property damage and advertising offense arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence.

\* \* \* \* \* \*

5.3 "applicable underlying limit" means (a) the amount of the applicable limits of liability of the policies of Underlying Insurance as stated in Section 1, or the amount stated in Section 1 as the Retained Limit, whichever is the greater, less the amount or amounts, if any, by which any aggregate limit so stated has been reduced solely by payment of claims in respect of personal injury, property damage or advertising offense which occurs while this policy is in force, or

(b) if the insurance afforded by such policies of Underlying Insurance is inapplicable to the occurrence, the amount stated in Section 1 as the Retained Limit; ...

\* \* \* \* \* \*

5.10 "occurrence" means an accident, including injurious exposure to conditions, which results, while this policy is in force, in personal injury, property damage or advertising offense which is neither expected nor intended from the standpoint of the insured;

5.11 "personal injury" means bodily injury, shock, mental anguish, sickness or disease ... except with respect to injury occurring in the course of the named insured's advertising activities, injury arising out of the publication or utterance of a libel or slander or of other defamatory or disparaging material, or a publication or utterance in violation of an individual's right of privacy.

5.14 "ULTIMATE NET LOSS" MEANS THE SUM ACTUALLY PAID OR PAYABLE IN CASH IN THE SETTLEMENT OR SATISFACTION OF ANY CLAIM OR SUIT FOR WHICH THE INSURED IS LIABLE EITHER BY ADJUDICATION OR SETTLEMENT WITH THE WRITTEN CONSENT OF THE COMPANY, AFTER MAKING PROPER DEDUCTION FOR ALL RECOVERIES AND SALVAGES COLLECTIBLE, AND INCLUDES ALL LOSS EXPENSES AND LEGAL EXPENSES (INCLUDING ATTORNEYS FEES, COURT COSTS, AND INTEREST ON ANY JUDGMENT OR AWARD) INCURRED BY THE INSURED IN ANY SUCH CLAIM OR SUIT, BUT EXCLUDES ALL SALARIES OF EMPLOYEES AND OFFICE EXPENSES OF THE INSURED OR THE COMPANY SO INCURRED.[1]

\* \* \* \* \* \*

6.5 When Loss Payable. The company's liability under this policy for ultimate net loss with respect to any occurrence shall not attach until the amount of the applicable underlying limit has been paid by or on behalf of the insured on account of such occurrence. The insured shall make claim for any loss under this policy as soon as practicable after

(a) the insured shall have paid ultimate net loss in excess of the applicable underlying limit with respect to any occurrence or

(b) the insured's obligation to pay such amounts shall have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant and the company.

Claim for any subsequent payments made by the insured on account of the same occurrence shall be similarly made. All losses covered by this policy shall be due and payable by the company within thirty days after they are respectively claimed and proven in accordance with the terms of this policy.

---

1. This definition of "ultimate net loss" is found in endorsement 5 to each of the policies.